Joseph **MITCHELL** et al., Claimants, Appellants,

v.

**EVELYN C. BROWN, INC.,** Petitioner, Appellee.

No. 5979.

United States Court of Appeals First Circuit.

Nov. 20, 1962.

Rehearing Denied Dec. 11, 1962.

---

Morris D. Katz, Boston, Mass., for appellants.

James A. Whipple, Boston, Mass., with whom Kneeland & Splane, Boston, Mass., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts in a case tried on the admiralty side of the court in which a petitioner-shipowner corporation sought exoneration from or limitation of liability and in which various claimant-crew members sought damages for personal injuries allegedly stemming from the unseaworthiness of petitioner's vessel

which sank while engaged in fishing on the Grand Banks. The petition for limitation and exoneration was denied and each of the claimants was awarded damages by the trial court after findings that the vessel was unseaworthy; that the defects were known to responsible officers of the ship-owner-corporation and that the defects where the cause of the sinking and the resultant injuries and losses sustained by the claimants.

On October 14, 1958 the F/V EVELYN C. BROWN left her port in Gloucester for the fishing grounds on the Grand Banks. The vessel was manned by a crew of ten, including the captain. All were "seamen" within the meaning of the Jones Act. At about 10 p. m. on the evening of October 19, 1958, while the vessel was about 800 miles from Gloucester and some 300 to 350 miles from the nearest land, a fire broke out in the engine room. All the crew—most of whom had retired for the night—turned out to fight the fire. The effort to control the fire continued for five hours when it was finally extinguished. To accomplish this it had been necessary to chop holes in the deck over the engine room and water continued ʼto flow into the vessel during the course of the fire and thereafter.

The ship's electrical system had become disabled and there was no current to operate the electric pumps. There existed one manual pump and for twenty hours the crew operated it continually in the vain attempt to stem the rising waters in the vessel. After twenty hours—seeing that their efforts were to be unavailing —the crew abandoned ship.

The F/V EVELYN C. BROWN carried three dories but when they were lowered to the water one immediately sank. The two remaining dories were referred to as "one man dories"—a term apparently deriving from the fact that during the normal course of fishing the dory would be manned by a single seaman. Each dory was approximately nineteen feet in length and five of the crew got into each one. They put off from the sinking ship and remained some fifty yards abeam until 3 a. m. October 21 when she sank.

Due to the failure of the electrical system, the crew had not been able to send any messages advising of their plight prior to abandoning ship. Consequently the captain took a compass bearing and the crew started to row in an easterly direction.

According to the testimony it was a moonless "black" night. The temperature was just above freezing—a gale wind started to blow—and, as found by the trial court, "reached forty knots, and the waves and swells increased in height."

Five men in each dory produced a conspicuously crowded condition. Manuel Mitchell testified that "I was so crowded in the stern that my knees were up to my chest. I was like that for 30—36 hours * * * I couldn't move." Other testimony was to the same effect.

One of the dories started to leak and had to be bailed out continually during all the time that the men were in it. The two dories were adrift for a period of some thirty-six hours, with certain members of the crew doing the bulk of the rowing. As they rowed, three ships came in sight but the frantic shouts and signals of the men apparently failed to attract attention. Finally, after about thirty-six hours, the men were rescued around 9 a. m. October 22, by the F/V FLOW. Some of the men had to be lifted on to the FLOW because of their inability to go aboard unassisted. They were given first-aid, food, stimulants, dry clothing and provided with bunks. Five days later, on October 27th, the FLOW landed in Gloucester.

As will be seen hereafter the men received varying injuries and were variously under doctors' care until January 16, 1959.

■ This appeal is related solely to the question of. damages. Specifically, claimants-appellants urge that the trial judge's award of damages must be viewed as clearly erroneous in two respects: (1) the amount that the trial judge recognized as proper compensation for

the element of "pain and suffering" sustained by each claimant and (2) the periods of disability which the court allowed for each claimant. We find no merit in claimants' argument concerning the proper extent and duration of the periods of disability and thus concern ourselves only with the amount of the awards for pain and suffering endured by the claimants.

The trial judge after recognizing that the men "suffered from exposure, and from anxious concern as to their fate" made the following findings concerning their specific injuries; the extent of their periods of disability and the amount of damages to which each was entitled.

"18. Joseph Mitchell suffered from smoke inhalation, exposure, hallucinations, swollen hands, contusion of the left eye, laceration of left fourth finger, blisters on his buttocks, and numbness of fingers. He incurred reasonable medical bills of $52. He was unable to return to his career as a fisherman for 1 month. The sinking of the vessel deprived him of a $400 share in the lay, $100 in clothing, and $150 in tools. His total damages are $1702.

"19. Ivan Conrad suffered severely from blisters on his knees and buttocks incurred while he was rowing and from radial neuritis due to extreme exposure. He has some permanent tingling in his fingers. He incurred reasonable medical bills of $75. He was unable to return to his career for 1 month. The sinking of the vessel deprived him of a $400 share in the lay and $100 in clothing. His total damages were $2,575.

"20. Francis Des Reis suffered a sprained hand and wrist, as well as exhaustion. He had reasonable medical bills of $25. He was unable to return to his career for 3 weeks. The sinking of the vessel deprived

him of a $400 share in the lay and $100 in clothing. His total damages are $1,275.

"21. Domingoes Raymond was struck by timbers while fighting the fire. He was severely cramped on the dory. He had scalp abrasions. Of his medical and X-ray bills only $100 was attributable to the events connected with the sinking of the EVELYN C. BROWN. He was unable to return to his career for 1 month. The sinking of the vessel deprived him of a $400 share in the lay and $100 in clothing. His total damages are $1,600.

"22. Milton Stone suffered from exposure and blisters. He was incapacitated for 2 weeks. He lost a $400 share in the lay and $100 in clothing. His total damages are $1,000.

"23. Raymond Brigham suffered from exposure and cramping. His heart condition was neither aggravated nor precipitated in any appreciable manner, by the events of October 19–27, 1958. He incurred medical bills of which $50 are reasonably related to these events. He was incapacitated until December 12. He lost a $400 share in the lay and $100 in clothing. The total damages suffered by him are $2,050.

"24. Manuel Mitchell suffered mostly from exposure, cramps, and fear. He incurred reasonable medical bills of $50. He lost $150 in pay and $100 in clothing. He was incapacitated for 2 weeks. His total damages are $800.

"25. Cesar Reis suffered from exposure, contusions, sprains, bruises, emotional shock, and hallucinations. Of his medical bills $100 is reasonably attributable to this accident. He was unable to return to his career for 1 month. He lost a $400 share in the lay and $100 in clothing. His total damages are $1,600." [1]

---

1. The district judge initially filed his Findings of Fact and Conclusions of Law on

November 30, 1961. Following claimants' motion for reconsideration of the ques-

Our approach to the adequacy of the damage awards for "pain and suffering" is made easier by the stipulation which was entered into by the parties and approved by the court. Because of the stipulation we are able to segregate with precision—after allowing for the amounts attributable to the stipulated values flowing from the trial judge's findings for each claimant—the residual dollar value accorded each claimant for pain and suffering. Without prolonging this opinion with the mathematics of the pertinent computations, suffice it to say that both parties agree in their briefs that each claimant received an award for pain and suffering in the following amount:

| | | |
|---|---|---|
| Joseph Mitchell | — | $320.00 |
| Ivan Conrad | — | $320.00 |
| Francis Des Reis | — | $249.00 |
| Domingoes Raymond | — | $320.00 |
| Milton Stone | — | $166.00 |
| Raymond Brigham | — | $480.00 |
| Manuel Mitchell | — | $166.00 |
| Cesar Reis | — | $320.00 |

Applying to these figures the total length of disability of each claimant as found by the court we note two things. The first is that the amount of the award for pain and suffering, physical and mental, apparently was not made on an individual basis, personal to each claimant, but was purely on a time basis. The two claimants who were disabled two weeks were each awarded $166. The four claimants who were disabled for a month each were awarded $320. The second is that the court paid little, if any, attention to whether the pain and suffering was attributable to the 61-hour ordeal

following the outbreak of the fire, or was endured at home awaiting recovery from relatively minor physical injuries. Thus Francis Reis, whose total disability lasted three weeks, received exactly 50 per cent more than Stone and Manuel Mitchell, whose disability lasted two weeks. Even those claimants whose disability lasted a month received only $50 less for the additional time than a straight per diem calculated on the basis of the shorter disability claimants.

We are forced to conclude, both from this mathematical comparison, but more important, from the extremely small awards, that the court gave, at best, little consideration to the harrowing experiences undergone by the claimants during the period between the fire and their eventual rescue. Very possibly a man who makes his living in a small vessel on the Grand Banks is more enured to hardship than a white-collar worker ashore. This does not mean, however, that when those hardships are multiplied he does not suffer. We cannot doubt that they were gravely multiplied in this case.

■■ This court has the power to adjust an award of damages in an admiralty case. Imperial Oil, Limited v. Drlik, 234 F.2d 4, 10, 11 (6th Cir.1956), cert. den., 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236; Lukmanis v. United States, 208 F.2d 260, 261 (2nd Cir.1953). See Farley v. United States, 252 F.2d 85 (9th Cir. 1958). To be sure, in this area reviewing courts are circumscribed by the "clearly erroneous" standard. Carroll v. United States, 133 F.2d 690, 694 (2d Cir. 1943). However, this standard—while stringent—does not foreclose evaluation and as the Supreme Court

tion of damages, the court granted a hearing on the motion. At the hearing claimants pointed out that in certain instances the trial judge's estimate of the extent of the periods of disability was even less than that which counsel for the shipowner had suggested as a reasonable period in the proposed findings which the latter had submitted. In another instance, counsel for claimants argues that although the court had made a specific finding as to a permanent residual medical condition in

the case of Conrad, the trial judge made no allusion to this in computing Conrad's proper measure of damages. The court took cognizance of these contentions and in each instance revised his initial award upward to embrace the asserted defects in his original findings. Amendments To The Finding of Fact And Conclusions of Law were filed on December 6, 1961. It is the amended findings which are set forth above.

put it—speaking in an admiralty case—"A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' [citing cases]." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). We are left with such a "definite and firm conviction that a mistake has been committed" here.

■ Damages are, of course, peculiarly a question of fact and when a judgment must be made on the monetary value to be accorded the elusive concept of pain and suffering great deference is due the determination of the fact finder—judge or jury—who sees and hears the witnesses. Cold records rarely reflect the look, the touch or the feel of the witness who recounts a personal tale of grief. The extra dimension—so vital to meaningful assessment—is missing. Yet, on occasion, there arises a case where even an impersonal record can supply this factor. We believe that this is such a case.

Without again recounting all the details of their harrowing experiences, it is obvious that when applied to these claimants—adrift in small boats and tossed by storm and sea after fighting a fire and vainly attempting to prevent the sinking of their ship—the elements of pain of body and anguish of mind are not the empty phrases of the pleader but the stark realities which accompanied men in circumstances fraught with the gravest peril. Surely, in these circumstances, it is reasonable to assume that the men feared for their lives. Indeed it would have been unreasonable had they not done so. But we are not left to conjecture or surmise as to subjective reactions. The record—so often characterized by the understatement of stolid fishermen—is crystal clear on this point. Thus, Ivan Conrad testified:

"Q. Can you tell us what happened in the dory, if anything, that will help us to understand what this experience amounted to? A. The weather was very rough. The dories are very small. There was quite a good sea going. We were scared. You're wet. You're cold. Mr. Mitchell was hysterical.

"Q. Which Mr. Mitchell? A. Mr. Joseph Mitchell.

"Q. The father? A. The father. His son was lying in the stern of the boat hysterical and crying.

"Q. Is there anything else you can tell us? A. You're sitting there rowing the dory. Every sea that comes along you say, 'This is it.' So it isn't a very comfortable feeling."

Cesar Reis testified:

"Q. Did you say you thought you were seeing things? A. Yes. You remember. I tell you that.

\* \* \* \* \* \*

"Q. Well, let us see if we can clarify this. Are you telling us that you were out of your mind? A. Yes, sir.

"Q. You were seeing things that were not there? A. Yes, sir. I see a lot of things.

"Q. What things did you see that were not there? A. I don't know.

\* \* \* \* \* \*

"Q. No. Tell us, please. I would like to know. A. I was talking to Mr. Stone. He was rowing. I was like this, and I saw like a big picture with nice looking girls but they're moving.

\* \* \* \* \* \*

"Q. All right, Mr. Reis. You thought you saw things that were not there? A. That's right. I remember thinking that if the dory capsized it be better for me.

"Q. Are you saying that a quick end would be better? Do you mean that you had given up hope? A. Give up hope, yes \* \* \*."

Manuel Mitchell testified:

"Q. Can you tell us what, if anything happened to you during the

time that you were in the dory? A. Well, I felt depressed.

"The Court: You felt depressed?

"The Witness: Sure. Under conditions like that? And finally I just gave up hope and laid back and waited.

"Q. Waited for what? A. For whatever was going to come.

\* \* \* \* \* \*

"Q. Can you tell us anything more about how you felt during that time you were in the dory? A. I just lay there. I got hysterical. I know I started hollering.

"Q. You started hollering? A. Yes, sir."

Upon a consideration of the above testimony and similar testimony, and upon a consideration of the entire record, we believe that the awards for pain and suffering are clearly erroneous. In a case such as this it is difficult to establish a precise standard for measuring damages. However, we believe that each claimant is obviously entitled to an additional award for suffering.

A judgment will be entered vacating the judgment of the district court as to damages and remanding the case to that court for recomputation of the awards for damages.

On Petition for Rehearing.

PER CURIAM.

Appellants have filed a petition for rehearing in which they ask us to determine the damages ourselves rather than to remand that matter to the district court. The cases which they cite, with one exception, are all relatively old. Even that one relied upon Standard Oil Co. of New Jersey v. Southern Pacific Co., 1925, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, a case decided at a time when an admiralty appeal constituted a trial de novo.

The matter of the mandate did not escape our attention at the time of our original decision. We have been slow to make independent findings of damages, even in admiralty, and our only recent exception has been when we believed we were in exactly the same position as the district court. The Texas Co. v. R. O'Brien & Co., Inc., 1 Cir., 1957, 242 F.2d 526. In our view, our only alternatives here were to send the matter back for a new determination by the district court, or to determine ourselves, not our view of the damages, but the minimum amount of damages which could have been awarded by the district court without constituting reversible error. United States Fidelity & Guaranty Co. v. United States, 2 Cir., 1945, 152 F.2d 46, 49. Of these alternatives we prefer the former.

The petition for rehearing is denied.