**CHRIS-CRAFT INDUSTRIES, INC.,**
**Plaintiff,**

v.

**PIPER AIRCRAFT CORPORATION**
**et al., Defendants.**

**No. 69 Civ. 2227.**

United States District Court
S. D. New York.
Aug. 19, 1969.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Arthur L. Liman, Sidney S. Rosdeitcher, Joseph J. Ackell, Alan L. Schlosser, New York City, of counsel, for plaintiff.

Chadbourne, Parke, Whiteside & Wolff, New York City, Donald L. Deming, Richard B. Leather, Zachary Shimer, New York City, of counsel, for defendant Piper Aircraft Corp. and individually named members of Piper family.

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, James V. Ryan, New York City, William L. D. Barrett, Nancy Pasley, of counsel, for Bangor-Punta Corp.

## OPINION

TENNEY, District Judge.

The instant suit arises out of the protracted and often bitter contest between plaintiff Chris-Craft Industries, Inc. (hereinafter referred to as "Chris-Craft") and defendant Bangor Punta Corporation (hereinafter referred to as "Bangor Punta") to gain control of defendant Piper Aircraft Corporation (hereinafter referred to as "Piper"). Alleging various violations by defendants of the Securities Act of 1933 and the Securities Exchange Act of 1934 and the Rules promulgated with respect to each such Act, Chris-Craft seeks an injunction *pendente lite* restraining Bangor Punta from: (1) accepting 107,574 shares of Piper common stock

tendered by the public shareholders of Piper to Bangor Punta pursuant to the terms of Bangor Punta's General Exchange Offer of July 18, 1969. Chris-Craft urges that these shareholders be given the opportunity to rescind their tenders after a "full and fair disclosure" has been made of the terms of Bangor Punta's exchange offer; (2) acquiring additional shares of Piper; (3) effecting a merger or consolidation of Bangor Punta and Piper; and (4) voting 120,200 shares of Piper purchased in May 1969 by Bangor Punta in five large cash transactions, effected neither on a securities exchange nor from or through a broker or dealer.

Piper is a publicly-held Pennsylvania corporation whose capital stock consists of 5,000,000 authorized shares of $1.00 par value common stock, of which approximately 1,641,890 shares are issued and outstanding. The Piper family, three of whom are members of Piper's Board of Directors and defendants herein, own approximately 501,090 of the 1,641,890 outstanding shares. Piper's stock has been listed on the New York Stock Exchange (hereinafter referred to as "the Exchange") since 1957.

Chris-Craft is a diversified manufacturer whose common and preferred stock and convertible debentures are traded on the Exchange. Bangor Punta is a publicly-held diversified corporation whose stock and bonds are also listed on the Exchange.

In January 1969 Chris-Craft, in an effort to gain control of Piper, began acquiring shares of Piper on the open market. On January 23, 1969, Chris-Craft publicly announced its interest in Piper and made a public tender offer for up to 300,000 shares of Piper stock at $65.00 per share with the "right to purchase excess shares."

Piper's Board of Directors, by letter dated January 27, 1969, advised Piper stockholders that in their opinion Chris-Craft's offer was inadequate and not in the best interests of Piper shareholders. Unsatisfied with the history of Chris-Craft's management, Piper's manage-ment and Board of Directors decided that the best interests of Piper and its shareholders required them to resist this attempted takeover.

On January 30, 1969, the Board of Directors of Piper and the Grumman Aircraft Engineering Corporation (hereinafter referred to as "Grumman") approved an agreement whereby Piper would sell 300,000 of its authorized but unissued shares to Grumman for $65.00 per share, in contemplation of thereafter exploring the possibility of a merger with Grumman. This agreement, although never realized, adversely affected Chris-Craft's cash tender offer, which expired on February 3, 1969.

On February 27, 1969, Chris-Craft filed a proposed registration statement and prospectus with the Securities and Exchange Commission (hereinafter referred to as "the SEC") in which it proposed to offer to exchange certain Chris-Craft securities for up to 300,000 shares of Piper.

Pursuant to its continuing efforts, on March 24, 1969 Piper issued 320,000 shares of its authorized but unissued common stock in exchange for all the outstanding stock of the United States Concrete Pipe Company of Florida, a subsidiary of a publicly-held investment company listed on the Exchange. At the same time, Piper exchanged 149,199 shares of its authorized but unissued common stock for approximately 99½ percent of the outstanding shares of Southply, Inc., a closely-held Louisiana corporation. The Board of Governors of the Exchange, with whom listing applications covering the issued shares were filed, felt that the distribution of almost 30 percent of Piper's authorized stock violated the Exchange's listing criteria. Accordingly, trading in Piper stock was suspended and delisting proceedings authorized. When Piper's management agreed to rescind these transactions, trading in Piper stock was resumed.

While Piper's prolonged efforts to fend off Chris-Craft raise serious questions as to the propriety of such conduct,

this action has little relevance to the instant proceedings. For the issues raised herein relate solely to Bangor Punta's exchange offer of July 18, 1969 and its purchases, for cash, of Piper stock in May 1969.

In early January 1969, defendant First Boston Corporation (hereinafter referred to as "First Boston"), an investment banking firm which serves as financial adviser to Piper, inquired whether Bangor Punta was interested in a possible acquisition of Piper. Although Bangor Punta responded affirmatively, nothing developed at that time. At a meeting convened on February 24, 1969, Bangor Punta explained that it would not consider attempting such an acquisition unless the Piper family sold their 501,090 shares to Bangor Punta. This condition was finally accepted by the Piper family on April 22, 1969.

On May 7, 1969, Chris-Craft publicly announced the terms of its then pending registration statement which proposed an exchange offer of Chris-Craft stock for 300,000 to 400.000 shares of Piper. The following day, after protracted discussions with Piper's representatives, a final agreement was entered into pursuant to which the Piper family agreed to exchange their shares for *specified* Bangor Punta securities. Additionally, the agreement provided that Bangor Punta would use its best efforts to acquire more than 50 percent of the outstanding shares of Piper stock. As part of those best efforts, Bangor Punta agreed to make an exchange offer to all other holders of Piper stock "under which such holders will be entitled to exchange each share of Piper common stock held by them for Bangor Punta securities and/or cash having a value, in the written opinion of The First Boston Corporation, of $80 or more." The agreement

further provided that if Bangor Punta succeeded in acquiring more than 50 percent of the outstanding Piper shares, and if, in the written opinion of First Boston, the value of the shares offered to the members of the Piper family was less than $80.00 on the opening day of the exchange offer, Bangor Punta would deliver to the members of the Piper family securities and/or cash with a value "equal to the difference between $80 and the Exchange Offer Value." No agreement had been reached at that time as to the components of the proposed package of Bangor Punta securities to be offered to the public Piper shareholders.

Later that same day, Bangor Punta and Piper issued identical press releases announcing that they had reached an agreement under which Bangor Punta would acquire the Piper family's interest in Piper and that:

> "Bangor Punta has agreed to file a registration statement with the SEC covering a proposed exchange offer for any and all of the remaining outstanding shares of Piper Aircraft for a package of Bangor Punta securities to be valued in the judgment of the First Boston Corporation at not less than $80 per Piper share."

At that time, Piper stock was selling on the Exchange at approximately sixty dollars.[1]

On May 26, 1969, the SEC instituted an action against Bangor Punta and Piper in the United States District Court for the District of Columbia. Therein, the SEC charged that the May 8th press release was "gun-jumping" in violation of Section 5(c) of the Securities Act of 1933, as amended, 15 U.S.C. § 77e(c),[2] and SEC rule 135. Without admitting any of the allegations of the complaint, Bangor Punta and Piper consented to the

---

1. Affidavit of John E. Flick, dated August 4, 1969, at 10.

2. Section 5(c) of the Securities Act of 1933, as amended, 15 U.S.C. § 77e(c), provides:

 "It shall be unlawful for any person, directly or indirectly * * * to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *."

entry of a final judgment of permanent injunction which enjoined them, *inter alia*, from offering to sell or from selling either of their securities until a registration statement was filed with the SEC as to such securities.

Bangor Punta filed its registration statement with the SEC covering its exchange offer on May 29, 1969. Included in the filing, as an exhibit to the registration statement, was a copy of the agreement of May 8, 1969. Preliminary prospectuses in the form contained in the registration statement were sent by Bangor Punta to all Piper shareholders of record on the same day the registration statement was filed. It became effective on July 18, 1969 and expired on July 29, 1969.

Bangor Punta now owns 728,864 shares of Piper, or 44.4 percent of its outstanding stock. As a result of its most recent exchange offer, which terminated on August 4, 1969, Chris-Craft has now acquired a total of at least 654,000 shares of Piper, or approximately 39.8 percent of its outstanding shares. With approximately 259,026 shares of Piper still in the hands of the public, it would appear that at this time neither Chris-Craft nor Bangor Punta has succeeded in gaining control of Piper.

■ Chris-Craft argues that the May 8th identical press releases of Bangor Punta and Piper constituted flagrant violations of Section 5(c) of the Securities Act of 1933, as amended, 15 U.S.C. § 77e(c) and SEC Rule 135, 17 C.F.R. § 230.135, in that no registration statement had been filed with the SEC prior thereto.

Until the actual execution of the May 8th agreement, only top management personnel and their confidential advisors had been advised of the negotiations with Piper. Upon execution, however, it became necessary to involve a great many other persons in the arrangements, such as an indenture trustee, independent auditors, printers, outside counsel and stenographers. Maintenance of security against premature disclosure of the terms of agreement became virtually impossible.[3] Since the $80.00 figure set by the terms of the agreement was substantially above the market price for a share of Piper stock, the opportunity for stock manipulations and unfair dealings in Piper stock by those who may have learned of the agreement prior to its becoming public knowledge was apparent. The May 8th press release would therefore appear both desirable and consonant with the directives of Securities & Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), *cert. denied*, Coates v. Securities & Exch. Comm'n, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Further, the guidelines for press releases issued by the Exchange on July 19, 1968 support this policy of timely disclosure.

"Negotiations leading to acquisitions and mergers, stock splits, the making of arrangements preparatory to an exchange, or tender offer, * * * are the type of developments where the risk of untimely and inadvertent disclosure of corporate plans is most likely to occur. Frequently, these matters require discussion and study by corporate officials before final decisions can be made. Accordingly, extreme care must be used in order to keep the information on a confidential basis.

"Where it is possible to confine formal or informal discussions to a small group of the top management of the company or companies involved and their individual confidential advisors where adequate security can be maintained, premature public announcement may properly be avoided. * * *

"At some point it usually becomes necessary to involve other persons to conduct preliminary studies or assist in other preparations for contemplated transactions, e. g., business appraisals, tentative financing arrangements, attitude of large outside holders, avail-

---

3. *Supra* note 1 at 9.

ability of major blocks of stock, engineering studies, market analyses and surveys, etc. Experience has shown that maintaining security at this point is virtually impossible. Accordingly, *fairness requires that the Company make an immediate public announcement as soon as confidential disclosures relating to such important matters are made to 'outsiders.'*

"The extent of the disclosures will depend upon the stage of discussion, studies, or negoations. So far as possible, public statements should be definite as to *price*, ratio, timing and/or any other pertinent information necessary to permit a reasonable evaluation of the matter. As a minimum, they should include those disclosures made to 'outsiders'." (Emphasis added.) New York Stock Exchange Company Manual at A–19 (July 19, 1968).

Section 5(c) of the Securities Act of 1933 makes it unlawful for any person directly or indirectly, to offer to sell or offer to buy any security unless a registration statement has been filed as to such security. The May 8th press release, however, merely asserts that Bangor Punta has agreed to file a registration statement with the SEC covering a proposed exchange offer for any and all of the remaining outstanding shares of Piper for a package of Bangor Punta securities. On its face, this press release cannot itself be construed as an offer to sell or buy securities. This view is supported by SEC Rule 135, which, in pertinent part, provides:

"(a) For the purposes only of Section 5 of the Act, the following notices sent by an issuer in accordance with the terms and conditions of this rule shall *not* be deemed to offer any security for sale:

\* \* \* \* \* \*

·"(2) A notice to any class of security holders of such issuer or of another issuer advising them that it proposes to offer its securities to them in exchange for other securities presently held by such security holders \* \* \*." (Emphasis added.)

Chris-Craft argues further that in addition to Section 5(c) and Rule 135, Rules 10b–5, 17 C.F.R. § 240.10b–5, and 10b–6, 17 C.F.R. § 240.10b–6, forbid a person making an exchange offer from placing a value on the securities being offered, since any opinion as to value might be self-serving and misleading.

SEC Rule 135 provides that "(a) notice to any class of security holders \* \* \* advising them that it proposes to offer its securities to them in exchange for other securities presently held by such security holders \* \* \* shall contain \* \* \* the name of the issuer and the title of the securities to be surrendered in exchange for the securities to be offered, [and] the basis upon which the exchange is proposed to be made \* \* \*."

Since, as previously noted, the precise components which were to comprise the package of Bangor Punta securities to be offered for each share of Piper had not been determined at the time of the May 8th press release, Bangor Punta and Piper could do no more than set forth the basis upon which the exchange offer was proposed in the same terms as contained in the May 8th agreement. Additionally, since the Exchange's guidelines for press releases prescribed that "[s]o far as possible, public statements should be definite as to price, ratio, timing and/or any other pertinent information necessary to permit a reasonable evaluation of the matter", the reference to the $80.00 figure cannot be deemed unjustified.

Nor can it be said, as Chris-Craft urges, that Piper and Bangor Punta have, by means of the May 8th press release and the latter's preliminary and final prospectuses, deliberately misled the public into believing that Bangor Punta would, in exchange for each share of Piper, tender securities immediately salable for $80.00, in violation of Sections 9, 10(b) and 14(e) of the Securities Exchange Act of 1934 as amended 15 U.S.C. § 78i, 15 U.S.C. § 78j (b), 15 U.S.C. § 78n(e), respectively,

and of the rules promulgated with respect to each such Act.

On July 18, 1969, First Boston rendered a formal opinion to Bangor Punta and Piper that based on the market and other conditions existing prior to the opening of business on July 18, 1969, the combination of securities provided for in the general exchange offer outlined in the registration statement had a value of not less than $80.00.

Such a determination, of course, is normally not a mechanical task but is essentially a matter of judgment. This evaluation was arrived at by a committee of eleven experienced and knowledgeable personnel. In reaching its collective judgment, the committee met on two different occasions to consider all the facts they deemed relevant. Additionally, over six weeks were spent in preparing the material upon which the committee relied.[4] No persuasive argument has been presented to the effect that the value placed on the package of Bangor Punta securities by First Boston was not reached in good faith. Surely, there is no basis for implying from the May 8th press release that such value would endure for the duration of the exchange offer, or be immediately realizable on any particular day. The vagaries of the marketplace belie such a construction. The value placed on the package may vary from buyer to buyer and from day to day. With this in mind, Bangor Punta specified at two places in its final prospectus, at the insistence of the SEC, that:

> "No guarantee of, or representation as to, the value of the securities offered by Bangor Punta pursuant to the Exchange Offer is or can be made."

"Clear misleading statements need be shown * * * before this court can enjoin a tender offer. * * * In the instant case the plaintiffs have failed to show clear misleading representations in the tender offer or the absence of statements in the tender offer which in combination with other representations would lead to a conclusion that fraud was being perpetrated upon unsuspecting shareholders." Jacobsen Mfg. Co. v. Sterling Precision Corp., 282 F.Supp. 598, 603 (E.D.Wis.1968); Fleischer and Mundheim, Corporate Acquisition by Tender Offer, 115 Penn.L.Rev. 317, 338 (1967).

■ Chris-Craft's contention that the letters of June 4 and June 20, 1969, sent to all Piper shareholders by W. T. Piper, Jr., Chairman of the Board of Directors and President of Piper, urging acceptance of the Bangor Punta exchange offer, violated Section 14(e) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78n(e), in failing to disclose that the Piper family might obtain additional securities if Bangor Punta was successful in gaining control of Piper, is unsound. This adjustment, provided for in the agreement of May 8th, was designed to compensate the Piper family for having fixed its exchange package more than two months prior to the effective date of the exchange offer and at a lower value than the initial package offered to the public. Simply put, it merely provided protection for the Piper family should the market value of the securities they were to receive be less than the value of the securities offered to other Piper shareholders. Realistically, I cannot say that there is a substantial likelihood that but for this omission in the letters of June 4 and June 20, 1969, a Piper shareholder would have accepted the Chris-Craft exchange offer rather than the Bangor Punta exchange offer. See General Time Corp. v. Talley Indus., Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

A copy of the agreement of May 8th, which contained this provision, was filed with the SEC on May 29, 1969, as an exhibit to the registration statement. Further, James J. Rochlis and C. Leonard Gordon, officers and directors of Chris-Craft, explained this provision in detail

---

4. Affidavit of John S. Buckley, dated August 4, 1969, at 2.

in a letter sent to all Piper shareholders prior to the issuance of Bangor Punta's final prospectus. At the suggestion of the SEC, reference to the possibility that the Piper family's package might be increased in the event Bangor Punta obtained control of Piper was printed on the cover page of Bangor Punta's final prospectus.[5] "Surely stockholders, once informed of the facts, have a right to make their own decisions in matters pertaining to their economic self-interest, whether consonant with or contrary to the advice of others, whether such advice is tendered by management or outsiders or those motivated by self-interest." American Crystal Sugar Co. v. Cuban-American Sugar Co., 276 F.Supp. 45, 50 (S.D.N.Y.1967).

 Rule 10b–6, 17 C.F.R. § 240.-10b–6, provides that it shall constitute a "manipulative or deceptive device or contrivance" under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), for an underwriter to purchase securities while he is still participating in their distribution.[6] R. A. Holman & Co. v. Securities & Exch. Comm'n, 366 F.2d 446 (2d Cir. 1966), *opinion amended on rehearing,* 377 F.2d 665 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967), *rehearing denied,* 389 U.S. 1060, 88 S.Ct. 767, 19 L.Ed.2d 867 (1968). Manipulation was one of the basic evils with which Congress was concerned in enacting statutes to regulate the securities market. See Section 2(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78b(3). Manipulation was often accomplished by those about to sell securities or already engaged in selling them, bidding on the market for the same securities, thereby creating an unjustifiable impression of market activity which would facilitate the sale at artificially high prices. As was noted in Securities & Exch. Comm'n

v. Scott Taylor & Co., 183 F.Supp. 904, 907 (S.D.N.Y.1959): "This was one of the practices which the Securities Exchange Act was designed to eradicate, and it is *the* practice which is covered by Rule X–10B–6." (Footnotes omitted.) (Emphasis added.) Weitzen v. Kearns, 271 F.Supp. 616, 623 (S.D.N.Y.1967); Securities & Exch. Comm'n v. Electronics Security Corp., 217 F.Supp. 831, 836 (D.Minn.1963). Bangor Punta's cash purchases of 120,200 shares of Piper in five transactions in May 1969, effected neither on the Exchange nor from or through a broker or dealer, were obviously not designed to place market pressures on the distribution price of Piper, so as to create an artificially high price for this security. Any increase in the price of Piper shares as a result of these transactions would obviously serve only to make Bangor Punta's exchange offer appear less desirable to Piper shareholders.

The SEC has recently proposed Rule 10b–13, which would prohibit a person making a cash tender or exchange offer for any equity security from purchasing such securities otherwise than pursuant to the cash tender or exchange offer. Although the release states that this new Rule is, in effect, a codification of existing interpretations under Rule 10b–6,[7] this Court has been unable to find, and has not been referred to, any support therefor. Moreover, the recent decision in Armour & Co. v. General Host Corp., 296 F.Supp. 470, 476 (S.D.N.Y.1969), would appear to the contrary.

"[S]ubstantial legal issues exist whether Rule 10–b(6) is applicable at all to the instant transactions. The principal question is whether subsection (b) of the Rule applies to the stock of the 'target' corporation [Piper], as well as that of the distributor."

---

5. Affidavit of John J. Martin, dated August 4, 1969, at 4–5.

6. "Distribution" comprises "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in

the hands of the investing public." Lewisohn Copper Corp., 38 S.E.C. 226, 234 (1958).

7. Release No. 34–8595, May 5, 1969, CCH § 77,706.

Finally, in considering Chris-Craft's contentions that Bangor Punta and Piper have violated the terms of the final judgment of permanent injunction in making various statements which have been attributed to them by the press, it is well to remember that such episodes may reflect "the difficulties commonly experienced in answering skilled and energetic reporters who seek more definiteness than there is, and the frailties inevitable in human communication * * *." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 951 (2d Cir. 1969). This, of course, would appear especially true when both Piper and Bangor Punta have expressly denied ever making such statements.[8]

It has been frequently noted that a preliminary injunction is an extraordinary equitable remedy which will be granted only upon a showing by the applicant therefor that it will probably succeed on the trial and that it will suffer irreparable injury if the defendant is not restrained from certain activity pending trial. American Metropolitan Enterprises of N. Y., Inc. v. Warner Bros. Records, 389 F.2d 903 (2d Cir. 1968), and the cases cited therein; Clairol Inc. v. Gillette Co., 389 F.2d 264 (2d Cir. 1968) (preliminary injunction will not be granted except upon a clear showing of probable success).

■ As previously noted, both the Chris-Craft and Bangor Punta exchange offers have expired. Neither party has gained control of Piper, and both are still in a position to do so. Although a finding by the trial court that plaintiff will ultimately prevail on the merits is not required before issuing a preliminary injunction when, as here, there would appear to be a lack of an adequate showing of irreparable damage, the party seeking a preliminary injunction has the burden of convincing the trial court with reasonable certainty that it will succeed upon the trial. Unicon Management Corp. v. Koppers Co., Inc., 366 F.2d 199, 204–05 (2d Cir. 1966). To show irreparable injury, Chris-Craft must at least demonstrate that "unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired." Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966). No such showing has been made herein; nor does it appear that the "balance of hardships" tip decidedly toward plaintiff.

■ "The historic injunctive process was designed to deter, not to punish." Hecht Co. v. Bowles, 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); Hambros Bank, Ltd. v. Meserole, 287 F.Supp. 69, 72 (S.D.N.Y. 1968). The conduct of Bangor Punta must be tested, as the Court of Appeals for the Second Circuit noted in both Electronic Specialty Co. v. International Controls Corp., *supra* at 948 of 409 F.2d, and Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 843 (2d Cir. 1967), by whether " 'any of the stockholders who tendered their shares would probably not have tendered their shares if the alleged violations had not occurred.' " After careful consideration, I cannot say that in the instant suit such would have been the case. The equities of the situation would, therefore, appear to speak against the issuance of a preliminary injunction. Armour & Co. v. General Host Corp., *supra* at 475 of 296 F.Supp.

It is not unlikely that further exchange offers to the remaining public shareholders of Piper may now be contemplated both by Bangor Punta and Chris-Craft. In this respect, then, it is wise to recall, as was noted in Sherman v. Posner, 266 F.Supp. 871, 874 (S.D.N.Y.1966), that:

"[N]o matter how clearly it was indicated otherwise, the issuance of the injunction undoubtedly would be viewed by some [of these Piper shareholders] as a favorable adjudication of the claims of the plaintiff. This would be tantamount to a determination of wrongdoing on the part of the * * * [Bangor Punta] management. Just how this result could be remedied in

8. Affidavit of Donald L. Deming, dated August 4, 1969, at 16; *supra* note 1 at 14–15.

the event it was found at a full hearing that the claims of the plaintiff were unfounded is not readily perceptible to this court."

See Kauder v. United Board & Carton Corp., 199 F.Supp. 420, 424 (S.D.N.Y. 1961); Mack v. Mishkin, 172 F.Supp. 885, 889 (S.D.N.Y.1959).

Accordingly, and for the foregoing reasons, plaintiff's motion is in all respects denied.

So ordered.