UNITED EGG PRODUCERS, Midwest Egg Producers Association, National Egg Company, Northeast Egg Marketing Association, Southwestern Egg Producers, Western Egg Co., Clements Eggs, Inc. and Austin T. Moore, Jr., Plaintiffs,

v.

BAUER INTERNATIONAL CORPORATION and John P. Bauer, Defendants.

No. 70 Civ. 194.

United States District Court,
S. D. New York.

March 17, 1970.

Richard L. Bond, Rosenwasser & Halperin, by David Halperin, New York City, for plaintiffs.

Herzfeld & Rubin, by Herbert Rubin, Edward L. Birnbaum, Daniel Riesel, New York City, for defendants.

## OPINION

BONSAL, District Judge.

Plaintiffs in this action have moved for a preliminary injunction against defendants. This action was instituted on January 16, 1970, pursuant to the Commodity Exchange Act, 7 U.S.C. § 1 et seq., and plaintiffs moved by order to show cause dated January 16, 1970, for an order "preliminarily enjoining the defendants from delivering or causing to be delivered false or misleading or knowingly inaccurate reports that affect or tend to affect the price of eggs in interstate commerce."

Plaintiff United Egg Producers is an agricultural cooperative, made up of five regional agricultural cooperatives: Midwest Egg Producers Association, National Egg Company, Northeast Egg Marketing Association, Southwestern Egg Producers, and Western Egg Company, which are also plaintiffs in this action. The five regional cooperatives in turn have a membership of approximately 500 commercial egg producers in the United States, and together these regional cooperatives market approximately fifty-five percent of the eggs sold in the United States.

Plaintiff Clements Eggs, Inc. is a commercial producer of eggs and a member of Northeast Egg Marketing Association.

Plaintiff Austin T. Moore, Jr. is president of Glenco Farms, Inc. a commercial egg producer and a member of National Egg Company. Moore is a trader in egg futures on the Chicago Mercantile Exchange.

Defendant Bauer International Corporation (Bauer International) is a New York corporation engaged in the import-export business, including the importation of eggs into the United States. Defendant John P. Bauer (Bauer) is president, chief executive officer, and a principal stockholder of Bauer International.

In their complaint plaintiffs allege that defendants knowingly delivered or caused to be delivered, for transmission through the mails and in interstate commerce, a series of false, misleading, or knowingly inaccurate reports concerning the proposed importation of 425,000 cases, or 153,000,000 Spanish eggs, that affected or tended to affect the price of eggs in interstate commerce, in violation of the Commodity Exchange Act. Plaintiffs, seeking both injunctive relief against and damages for defendants' alleged violations, point specifically to Section 13(b), which provides in pertinent part:

"It shall be a felony * * * for any person * * * knowingly to deliver or cause to be delivered for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning * * * market information or conditions that affect or tend to affect the price of any commodity in interstate commerce."

Hearings were held on the motion for a preliminary injunction on January 21, 22, 23, and 27, and February 2, 1970, which developed the following facts in addition to those hereinbefore stated.

During the months of December, 1969, and January, 1970, news of a proposed importation of a large quantity of Spanish eggs by Bauer International was carried in the *Journal of Commerce, The Poultryman,* the *Chicago Sun-Times,* the Maine *Telegram, Barrons, Reuters News Service,* the New York *Daily News, The Wall Street Journal,* and the *New York Post.* Also during this period, Bauer International, directly and through a news service, disseminated news releases concerning its importation of Spanish eggs to the news media.

On December 3, 1969, Bauer International transmitted a release entitled, "Re: a new development in Spanish-American trade—the shipment of shell eggs from Spain to the United States," to United Press International. Bauer testified that Bauer International sent the release out, that its contents were intended for the American reading public, and that the December 3, 1969 *Journal of Commerce* article was based on it. Portions of the release which appeared in the *Journal of Commerce* follows:

"A quantity totalling 425,000 cases of 30 dozens each (which equals 12,-750,000 dozens or 153,000,000 eggs) have been purchased by one American company.

\* \* \* \* \* \*

"The first shipment of these shell eggs will be leaving Spain for the USA during the week of December 8, 1969.

\* \* \* \* \* \*

"Three refrigerated vessels, namely the S/S PONGAL with 295,000 cubic feet, and the S/S BLUE STAR with 373,000 cubic feet, and the S/S VILLAFRIA with 410,000 cubic feet, have been made available to ship these eggs under regulated temperature from the ports of Vigo, Cadiz, Bilboa, to the USA."

On December 17, 1969, Bauer International sent a teletype of a news release to P.R. Wire Service, a membership news agency. The release read in part:

"The first shipment of Spanish shell eggs ever to be shipped to the USA from Spain is scheduled to arrive on the steamer SEA WITCH of the Sealand Container Lines on December 19, 1969 \* \* \*.

"\* \* \* experts from the egg industry and former ranks of the U. S. Dept. of Agriculture have completed their inspection of all the eggs which have been purchased by Bauer International Corp. New York. \* \* \*

"The shipments to the USA will proceed rapidly from now on on regular scheduled steamers operating from Spain to New York."

The release was transmitted by P.R. Wire Service on its transcontinental wire, and the contents of the release served as the basis for the December 20, 1969 article in *The Poultryman*.

On January 7, 1970, P.R. Wire Service received a second release from Bauer International. That release, which contained instructions that it be disseminated "to all the editors of economic and commodity news throughout USA including wire services", read in pertinent part:

"The first shipment from a total purchase made by Bauer International Corporation, New York, of 425,000 cases, or a total of 153 million eggs has arrived on board the vessel, SEA WITCH, of the Sealand Container Line. The eggs \* \* \* were found to be of absolutely excellent condition.

\* \* \* \* \* \*

"From here on in the shipments will continue at a rapid pace and during the next ten days, over 100,000 cases amounting to 36 million eggs, will be loaded on board \* \* \* different vessels for New York City. The entire quantity will have been shipped before the 25th of January, 1970."

With no significant alteration to these portions, the release was transmitted on the transcontinental wire by P.R. Wire Service.

Bauer testified that he personally aided in the composition of the release, and that it was sent to P.R. Wire Service. However, he denied that his release was the basis for, or that he furnished the information contained in, a Reuters wire which came out on January 7. The Reuters wire read in part:

"11:27 : : : first Spanish eggs ever arrive : : New York, Jan. 7—The first shipment from a total purchase of Spanish eggs made by Bauer International Corporation has arrived, the company reported.

"The shipment comprised 425,000 cases, or a total of 153 million eggs which arrived on board the vessel 'SEA WITCH'. The company described the quality as 'of absolutely excellent condition'.

"From here on in the shipments will continue at a rapid pace. During the next ten days, over 100,000 cases amounting to 36 million eggs, will be loaded on board different vessels bound for New York City.

"The entire quantity will have been shipped before January 25, the company added."

Reuters issued a further wire on January 7 which read in pertinent part:

" : : add item sent 11:27 EST

first shipment Spanish eggs arrive:

"New York Jan. 7—The Bauer International Company later explained that their total purchase of Spanish shell eggs was for 425,000 cases of which only 2400 cases arrived currently on the 'SEA WITCH'.

"Mr. Bauer also said that contrary to their earlier schedule that the entire 425,000 cases would be shipped by January 25, the shipments would not now be completed to the U.S. before some time in February * * * "

Bauer testified that he did not speak with anyone from Reuters with respect to the Spanish eggs.

Bauer testified that on occasion he talked to the press, but that most of the time he referred them to Curtis J. Hoxter, Inc. (Hoxter), a public relations counsel employed by Bauer International during December, 1969, and January, 1970. Bauer did not know what Hoxter might have said to the press with respect to the Spanish eggs, and Hoxter was out of the country at the time of the hearings.

With respect to his arrangements for importing the Spanish eggs which were the subject of the news articles and Bauer International's releases, Bauer testified that he went to Spain and remained in that country from November 21 through November 23, 1969, and that while in Spain, he dealt through a Spanish agent, Corpique, with the Asociacion Nacional Sindical Avicola (ANSA), which was offering a large quantity of Spanish eggs for sale.

Bauer testified that he entered into a purchase agreement with ANSA whereby Bauer International would buy and ANSA would sell Spanish storage eggs in an amount originally set at 200,000 cases, then increased to 225,000 cases, and finally set at 425,000 cases towards the end of November or beginning of December. "Storage" eggs are eggs which are over thirty days old. Eggs that are thirty days or less are "fresh" eggs. There are thirty dozen eggs per case. Telexes between Bauer International and Corpique were offered as confirmation of the agreement. Bauer testified that Corpique acted as an intermediary for Bauer International and ANSA and that Corpique received a commission from ANSA.

With regard to inspection of the eggs, Bauer testified that the purchase agreement was subject to the eggs passing inspection by representatives of Bauer International, both in the warehouses and at the time of loading on the carrier. Bauer explained, however, that it was understood between himself and ANSA that "this would be a bona fide and an expert, technically well organized inspection, but not capriciously refusing or rejecting anything of that sort." Bauer said that if the inspectors had found that the conditions in the warehouses were such that eggs could not have been marketed in the United States, he would not have accepted them. He testified that he had a further agreement with ANSA, which was worked out at the same time as the purchase agreement itself, that ANSA would replace those eggs which were rejected with fresh eggs at a different price.

On November 24, 1969, Bauer International, through the International Cooperative Bank in Basel, Germany, opened an irrevocable letter of credit with the

Banco de Santander, Madrid, in favor of ANSA for $800,000. covering 200,000 cases of Spanish shell eggs, which letter was to expire on December 24, 1969. On November 25, 1969, the letter of credit was increased to $945,000. covering 225,000 cases. On December 3, 1969, Bauer International sent a Telex to the International Cooperative Bank instructing the Bank to increase the November 24, 1969 letter of credit to $1,800,000. covering 425,000 cases.

On December 29, 1969, Bauer International opened an irrevocable letter of credit with the Banco de Santander through the International Cooperative Bank in favor of ANSA for $315,150. covering 75,000 cases of Spanish shell eggs. The letter was to become valid "only against returning [the prior letter] for about $1,800,000," and was to expire on January 20, 1970. Bauer testified that this letter was a revolving letter of credit, but the terms of the letter in evidence do not so indicate.

The terms of the November 24, 1969 letter of credit as amended on November 25, 1969, required, among other things, the presentation of two certificates of inspection on original stationery of Bauer International. The first was to certify that, "the following cases of eggs have been found suitable for acceptance and for shipment to Bauer International Corporation, New York." The second was to certify that "the number of cases of eggs, which have been loaded aboard steamer are identical with the ones for which the [first] certificate * * * has been issued."

Bauer sent three representatives to Spain to inspect the eggs. Inspectors Vizbarra, Rose, and Forsythe inspected the eggs in warehouses throughout Spain. Due to the vast quantity, they inspected eggs in cases chosen at random from those in a warehouse and considered the findings representative of the eggs in that warehouse. The results of the inspection were Telexed to Bauer daily by Vizbarra. On the basis of their inspection, the three men compiled a "Summary of Quality Inspection Team" in Madrid prior to Vizbarra's return to the United States on December 16, 1969. The summary classified the eggs in each warehouse according to grades of quality, using the designations No. 10, No. 20, and No. 30 to differentiate them. No. 10 referred to eggs which were "good for export to the U.S.A., with perhaps a small amount of repacking—less than 5% loss." No. 20 referred to eggs requiring "much repacking and further inspection or export to other countries else than U.S.A.—loss eggs: 5–10%, repacking may be required on as many as 50%." No. 30 "would be those eggs not fit for human food without additional course of inspection case by case. Greater than 10% loss. The summary showed that there were 248,943 cases in grade No. 10; 106,731 cases in grade No. 20; and 21,746 cases in grade No. 30, for a combined total of 377,420 cases of eggs. While Bauer testified that grades No. 10 and No. 20 were both of a quality which was available to be brought into the United States, Vizbarra testified that the 248,943 cases in category No. 10 were suitable for export to the United States and that the others were suitable for export to countries other than the United States.

The terms of the December 29, 1969 letter of credit, among other things, required presentation of two inspection certificates. Both were to be issued by Supervigilancia Sociedad General de Control S.A., acting as correspondents of Superintendence Company, Inc. (Superintendence). Bauer testified that he had originally expected that Vizbarra would complete the inspection necessary to issue the required certificates, but that Vizbarra returned to the United States on December 16, 1969. The first certificate was to be issued at the time of loading out of cold storage on trucks for transportation to the port, certifying "that the following cases of eggs have been found suitable and in good condition for shipment to Bauer International Corporation, New York." The second certificate was to be issued at the time

of loading on board ship to New York, certifying the number of cases of eggs which are stowed on ship and indicating, among other things, the name of the cold storage from which these eggs originated.

Bauer testified that he also had an agreement with Superintendent whereby as the cases were moved out of cold storage, they were to inspect them and if they found any broken or spoiled eggs, they were instructed to replace them with fresh eggs which were to be supplied by ANSA in accordance with the purchase agreement. Bauer testified that he gave these instructions to Superintendence in December after Vizbarra returned to the United States. Two Telexes sent by Bauer International to Superintendence embodying these instructions are dated January 23, 1970, after commencement of this action.

Bauer conceded that he had no written contracts for shipment of the eggs to the United States and that the only shipment of Spanish eggs which arrived in the United States prior to the close of the hearings on February 2, 1970 was one consisting of 2400 cases of fresh eggs which arrived on the SEA WITCH in late December, 1969. Bauer testified that he negotiated for the purchase of the 2400 cases of fresh eggs from ANSA at the same time that he was negotiating with respect to the storage eggs, but he conceded that the 2400 cases of fresh eggs were not included in the alleged agreement to purchase 425,000 cases. At the close of the hearings, Bauer testified that Bauer International had booked space on three vessels of the Spanish North American Line for a total of 100,000 to 125,000 cases of storage eggs and 20,000 to 25,000 cases of fresh eggs, and that he had been informed that the vessel GISELA VENNMANN was loaded with 30,000 to 35,000 cases of storage eggs and 10,000 cases of fresh eggs, and would sail from Valencia.

On the basis of the facts adduced at the hearing the court concludes that on December 3, 1969, December 17, 1969, and January 7, 1970, Bauer International knowingly delivered or caused to be delivered for transmission in interstate commerce by Telex, reports concerning the importation of Spanish eggs into the United States which were false, misleading, and knowingly inaccurate in material respects, and that the reports tended to affect the price of eggs in interstate commerce.

It is not disputed that Bauer International knowingly caused the transmission in interstate commerce of Telex releases concerning Spanish eggs to the news media on December 3, 1969, December 17, 1969, and January 7, 1970, and that these releases were intended for the American reading public. The January 7 release, for example, directed P. R. Wire Service to disseminate its contents "to all the editors of economic and commodity news throughout USA including wire services."

In its December 3 release, Bauer International stated that 425,000 cases of Spanish eggs had been purchased. The evidence does not show that at the time the release was issued there was a contract for the purchase of 425,000 cases of Spanish eggs by Bauer International or that there was available in Spain 425,000 cases of eggs which were of a quality that could be imported into the United States.

The purchase agreement concerning which Bauer testified was at most a gentlemen's agreement. No written agreement between Bauer International and ANSA was offered, and the Telexes between Bauer International and Corpique are not evidence of a contract between Bauer International and ANSA since there is no proof that Corpique acted in any capacity other than as Bauer's agent. The letters of credit are merely evidence of the financial responsiblity of Bauer International. The amended letter of credit for $1,800,000. covering 425,000 cases to which the December 3, 1969 Telex refers was not produced at the hearing, and the November

24, 1969 letter of credit, as amended on November 25, was only for $945,000. covering 225,000 cases.

At the time Bauer International issued the December 3 release which spoke in terms of a purchase of 425,000 cases, Bauer knew that there were not 425,000 available cases of Spanish eggs of a quality that could be imported into the United States. Bauer conceded that he did not believe from the beginning of his negotiations with ANSA that there were 425,000 cases of storage eggs in Spain which were in a condition for shipment to the United States. He testified, however, that he had an agreement with ANSA that they would replace all the eggs which were rejected with fresh eggs at a different price, and that he always intended to ship 425,000 cases of eggs to the United States. No document was produced by Bauer embodying his agreement with ANSA for the replacement of rejected eggs with fresh eggs, and the only evidence of any such agreement is a Telex dated January 23, 1970 from Bauer International instructing Superintendence to replace spoiled eggs with "good eggs which Messrs. Ansa will deliver." That Telex was prepared subsequent to the commencement of this action, and approximately two months after Bauer claims to have reached such an agreement with ANSA. Furthermore, the letters of credit, which contain conditions as to quality, make no reference to the replacement of rejected storage eggs with fresh eggs. Accordingly, the court concludes that the December 3 release was false, misleading, and knowingly inaccurate in describing a purchase of 425,000 cases of Spanish eggs.

Bauer International failed to specify in its December 3 release that the eggs which it claimed to have purchased were "storage" eggs. As it is understood in the egg business that when one refers to eggs, the reference is to fresh eggs, Bauer International's failure to state that the eggs were storage eggs gave the misleading impression that the 425,000 cases of Spanish eggs were fresh eggs. There can be no question that Bauer knew the significance of his failure to specify that the eggs were storage eggs. Bauer's experience in agricultural products, including eggs, has amounted to twenty years, and in other communications during the same period he referred to the eggs as "storage eggs of Spanish origin."

Finally, the December 3 release was false, misleading, and knowingly inaccurate in material respects in that no basis has been shown for the statement that "the first shipment of these shell eggs [of the 425,000 cases] will be leaving Spain for the USA during the week of December 8, 1969." The vast number of Telexes concerning arrangements for shipping indicate that on December 3, the date of the release, and on the days which followed, Bauer International was still negotiating with numerous shipping companies for vessels for the storage eggs, and there appears to be no basis for belief on December 3 that any shipment of the storage eggs would be leaving Spain during the week of December 8, 1969.

In its December 17, 1969 release, Bauer International referred to the anticipated arrival of the SEA WITCH with "the first shipment of Spanish eggs" and asserted that experts "have completed their inspection of all the eggs which have been purchased by Bauer International Corp." and that "the shipments to the USA will proceed on regular scheduled steamers." The release was misleading in that no distinction was drawn between the fresh eggs aboard the SEA WITCH and the eggs which were to be shipped later, which were storage eggs. Furthermore, the false impression was given that the shipment aboard the SEA WITCH was the first shipment of the 425,000 case purchase referred to in Bauer International's December 3 release. Bauer conceded that the 2400 cases of fresh eggs aboard the SEA WITCH were not included in the alleged agreement to purchase 425,000 cases.

In its January 7 release, Bauer International announced that "the first shipment from a total purchase made by the Bauer International Corporation, New York, of 425,000 cases, or a total of 153 million eggs, has arrived on board the vessel, SEA WITCH."

The evidence does not show that at the time the release was issued there was a contract for the purchase of 425,000 cases of Spanish eggs by Bauer International or that there were available in Spain 425,000 cases of eggs which were of a quality that could be imported into the United States. As has been pointed out with respect to the December 3 release, *supra*, the purchase agreement about which Bauer testified was at most a gentlemen's agreement. Furthermore, by its terms, the November 24 letter of credit and the November 25 amendment thereto, increasing the credit to $945,000. and the number of cases covered to 225,000, expired on December 24, 1969. As the alleged amended letter of credit for $1,800,000. covering 425,000 cases, which was not produced, would also have expired on December 24, 1969, the only letter of credit which was valid on January 7 when the release was issued was the one dated December 29, 1969 covering 75,000 cases. While Bauer testified that the December 29 letter was a revolving letter of credit, no other evidence of its revolving nature was offered, and the court concludes that the most that the letter shows is that Bauer International had funds to purchase 75,000 cases from December 29 until its expiration date on January 20, 1970.

The evidence also indicates that at the time Bauer International issued the January 7 release, Bauer knew that there were not 425,000 available cases of Spanish eggs of a quality that could be imported into the United States. As of December 16, 1969, when Vizbarra returned to the United States, Bauer was apprised of the results of the three-man inspection. On the basis of the "Summary of Quality Inspection Team," Vizbarra testified that only the 248,943 cases in grade No. 10 were suitable for export to the United States, and even if Bauer's assertion that the 350,000 cases in grades No. 10 and 20 could be exported to the United States were accepted, there was no showing that a supply of fresh eggs approaching 75,000 cases was available in Spain to replace those unsuitable for export to the United States. Accordingly, the court concludes that the January 7 release was false, misleading, and knowingly inaccurate in describing a purchase of 425,000 cases of Spanish eggs.

As was the case in both the December 3 and December 17 releases, the 425,000 cases were not designated as storage eggs in the January 7 release, thereby giving the false impression that they were fresh eggs. Of greater significance, however, is the fact that the release stated that the eggs which arrived on the SEA WITCH, and which were described as "of absolutely excellent condition", were the first shipment from Bauer International's purchase of 425,000 cases. This statement was false, as Bauer conceded that the 2400 cases on the SEA WITCH were not included in the alleged agreement to purchase 425,000 cases. There can be no doubt from a reading of the release that Bauer International intended to convey the false impression that the first shipment of the 425,000 case purchase had arrived.

Accordingly, the court concludes that the December 3, December 17, and January 7 releases were false, misleading, and knowingly inaccurate in material respects when issued.

The fact that P.R. Wire Service edited some of the statements in the releases sent to it by Bauer International before using them to the news media is immaterial. No significant alterations were made in those statements which the court has found to be false, misleading, or knowingly inaccurate, and P.R. Wire Service merely reinforced attribution of the statements to Bauer so that they would not be responsible for the content.

The December 3, December 17, and January 7 releases tended to affect the price of eggs in interstate commerce. Egg contracts are bought and sold on commodity exchanges throughout the United States. The principal exchange for future transactions in eggs in the United States is the Chicago Mercantile Exchange. The trading on the Chicago Mercantile Exchange is only in fresh eggs.

The testimony established that the price of eggs is volatile, that supply is the most important factor in determining the price, and that reports of increased supply affect the price. During the latter part of 1969, both fresh and storage eggs were in short supply, and demand was relatively constant. Egg processors, who purchase storage eggs in large quantities, were buying fresh eggs in November and December, 1969, because as one processor testified, "We were buying any eggs we could lay our hands on."

Bauer International's December 3 release was published in the *Journal of Commerce* on December 3. The price of January egg futures on the Chicago Mercantile Exchange, which had risen steadily from November 25, 1969, began falling on December 5, 1969.

Bauer International's December 17 release was published in *The Poultryman* on December 20, 1969. The price of December egg futures on the Chicago Mercantile Exchange fell the limit of 200 points (2 cents per dozen) on December 22, the first trading day after publication of the article.

Bauer International's January 7 release came out on Reuters wire the same day, and the price of January egg futures on the Chicago Mercantile Exchange dropped 150 points (one and one-half cents per dozen).

The testimony brought out that price fluctuations on the Chicago Mercantile Exchange on December 5, December 22, and January 7 were due to the announcements of the availability of a large quantity of Spanish eggs.[1]

The court concludes that the false, misleading, and knowingly inaccurate statements in Bauer International's December 3, December 17, and January 7 releases tended to affect the price of eggs in interstate commerce.[2]

Bauer was familiar with the futures market on the Chicago Mercantile Exchange. He testified that in December, 1969, he sold short on the Chicago Mercantile Exchange as a hedge against Bauer International's imports of eggs from Holland and Denmark. He denied that he sold short as a hedge with respect to imports of Spanish eggs. There is no doubt that Bauer knew that the releases issued by Bauer International would tend to affect the price of eggs on the Chicago Mercantile Exchange.

■■ The court has jurisdiction to grant plaintiffs injunctive relief under

---

1. It is true that Reuters' editors misconstrued Bauer International's January 7 release and stated that "the shipment comprised 425,000 cases," but the mistake would not have been made by Reuters if Bauer International had not stated in its release that the shipment on the SEA WITCH was part of its 425,000 case purchase.

2. On December 11, 1969, the price of egg futures on the Chicago Mercantile Exchange for both December and January delivery began falling, and fell the limit of 200 points (2 cents per dozen) on each of the next two trading days. There was testimony at the hearings that the drop in the price of eggs resulted from two newspaper articles announcing the importation of a large quantity of Spanish eggs. On December 10, the New York *Daily News* reported that "A Wall Street import-export house expects the first shipment of a 13 million dozen order to arrive from Spain today * * *," and an article on December 11 in *The Wall Street Journal* announced the arrival of "the first supply to come in against a reported 13-million dozen order." Bauer testified that he read the December 10 *Daily News* article but denied any responsibility for its content. Bauer could not state what his public relations counsel, Hoxter, might have said to the press with respect to the Spanish eggs. However, Bauer made no attempt to deny the story, which he knew to be false.

the Commodity Exchange Act. As stated in Goodman v. H. Hentz & Co., 265 F.Supp. 440, 447 (N.D.Ill.1967):

"Violation of a legislative enactment by doing a prohibited act makes the actor liable for an invasion of the interest of another if: (1) the intent of the enactment is exclusively or in part to protect the interest of the other as an individual; and (2) the interest invaded is one which the enactment is intended to protect. Restatement, Torts, Section 286. Violation of the standard of conduct set out in Section 6b of the Commodity Exchange Act is a tort for which plaintiffs, as members of the class Congress sought to protect from the type of harm they allege here, have a federal civil remedy even in the absence of specific mention of a civil remedy in the Commodity Exchange Act. The Restatement rationale was the basis for the presently well accepted rule that a civil remedy cognizable in the federal courts will be implied for a defrauded investor under Section 78j of the Securities Act of 1934 and Securities and Exchange Commission regulation 10b–5 thereunder. Kardon v. National Gypsum Co., D.C., 69 F.Supp. 512 (1946).

"* * * Defendant, pointing out that the *Kardon* line of cases relies at least in part on other sections of the Securities Exchange Act which allow private civil actions, contends that the complete absence of provision for private civil actions in the Commodity Exchange Act must be decisive here. However,

" 'Implied rights of action are not contingent upon statutory language which affirmatively indicates that they are intended. On the contrary, they are implied unless the legislation evidences a contrary intention. Brown v. Bullock, D.C., 194 F.Supp. 207, 224, aff'd on other grounds, 2 Cir., 294 F.2d 415; cited in Wheeldin v. Wheeler, 373 U.S. 647 at 661, 662, 83 S.Ct. 1441, 10 L.Ed.2d 605 (Brennan, J., dissenting).'

"There is no indication in the Commodity Exchange Act that Congress intended not to allow private persons injured by violations access to the federal courts."

It has been stated that:

"The fundamental purpose of the Commodity Exchange Act 'is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves.' " Campbell, "Trading in Futures under the Commodity Exchange Act," 26 Geo.Wash.L.Rev. 215, 223 (1958) (footnote omitted).

The plaintiffs are within the class that Congress intended to protect from false, or misleading, or knowingly inaccurate reports concerning conditions which affect or tend to affect the price of a commodity in interstate commerce by the enactment of the Commodity Exchange Act and specifically Section 13(b).

On the evidence, the plaintiffs have shown a clear probability of success at trial.

Since the commencement of this action, Bauer International has issued two additional releases. A release dated January 19, 1970, stated that:

"The long heralded shipments from Spain are * * * starting now in heavy quantities * * *. The shipments of the entire available quantity purchased for shipment to the USA will be completed by the end of February."

At the hearings, Bauer testified that as of February 2, 1970, no shipment of the storage eggs had departed from Spain, and in an affidavit dated March 11, 1970, Bauer informed the court that the only shipment to arrive in the United States before the end of February was a 24,380 case shipment aboard the GISELA VENNMANN. The falsity of the

January 19 release indicates the necessity for the issuance of an injunction.

■ The Chicago Mercantile Exchange is a regulated futures market and "transactions in commodity involving the sale thereof for future delivery as commonly conducted on the boards of trade and known as 'futures' are affected with a national public interest," 7 U.S.C. § 5. In view of the public interest in insuring fair practice and honest dealing on the commodity exchanges, a showing by plaintiffs of irreparable injury in the usual sense is not a necessary prerequisite to the issuance of a preliminary injunction. As stated by Judge Friendly in Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1968):

> "A plaintiff asking an injunction because of the defendant's violation of a statute is not required to show that otherwise rigor mortis will set in forthwith; all that 'irreparable injury' means in this context is that unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired. At least that is enough where, as here, the only consequences of an injunction is that the defendant must effect a compliance with the statute which he ought to have done before."

See, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 303 F.Supp. 191, 199 (S.D.N.Y.1969); Armour and Company v. General Host Corp., 296 F.Supp. 470, 474 (S.D.N.Y.1969).

The only consequences of an injunction against defendants would be to force compliance with Section 13(b), and defendants will not be prevented from conducting legitimate business activity, including the importation of Spanish eggs. However, defendants should be enjoined from the making of further false, misleading, or knowingly inaccurate reports concerning conditions that affect or tend to affect the price of eggs in interstate commerce because, if further releases are issued, plaintiffs,

the public, and the Chicago Mercantile Exchange will suffer harm which cannot be repaired. Under these circumstances, plaintiffs, have made an adequate showing of irreparable injury. Studebaker Corp. v. Gittlin, supra.

■ Defendants contend that plaintiffs are not entitled to equitable relief because they do not come into court with clean hands. Defendants assert that plaintiffs are "engaging in a combined effort to achieve the highest possible prices through various programs" in violation of the antitrust laws. The evidence indicates that plaintiffs market approximately fifty-five percent of the eggs sold in the United States, but the possibility that plaintiffs are violating the antitrust laws is no defense in this proceeding for a preliminary injunction to protect the public. In Union Pacific R. Co. v. Chicago and North Western Ry. Co., 226 F.Supp. 400, 410 (N.D.Ill. 1964), the court stated:

> "In the application of the maxim [of unclean hands], the courts act for their own protection in obedience to the demands of public policy and with a wide range of discretion.
>
> " * * * Where a public interest is at stake, above the interests of the parties themselves, the protection of that paramount interest overcomes the judicial reluctance to assist a wrongdoer."

Plaintiffs and the public are entitled to protection against the issuance of further false, misleading, and knowingly inaccurate statements.

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

A preliminary injunction will issue enjoining defendants from delivering or causing to be delivered for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports that affect or tend to affect the

price of eggs in interstate commerce, upon the posting by plaintiffs of a $100,000. bond.

Settle form of injunction on notice.