516 F.2d 172
 Fed. Sec. L. Rep. P 95,058
CHRIS-CRAFT INDUSTRIES, INC., Plaintiff-Appellant-Cross-Appellee,
v.
PIPER AIRCRAFT CORPORATION et al.,
Defendant-Appellees-Cross-Appellants.
 Nos. 672, 1055, Dockets 74-2542, 75-7003.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1975.
Decided April 11, 1975.
Rehearing En Banc Denied June 9, 1975.
 
 Arthur L. Liman, New York City (Stuart Rabinowitz, Jack C. Auspitz, Anthony M. Radice, Richard A. Miller, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for Chris-Craft Industries, Inc.
 James V. Ryan, New York City (C. Kenneth Shank, Jr., Allan J. Graf, and Webster Sheffield Fleischmann Hitchcock & Brookfield, New York City, on the brief), for Bangor Punta Corp., Nicolas M. Salgo and David W. Wallace.
 John F. Arning, New York City (Charles W. Sullivan, Richard Urowsky, and Sullivan & Cromwell, New York City, on the brief), for The First Boston Corp.
 Zachary Shimer, New York City (Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief), for Howard Piper, Thomas F. Piper and William T. Piper, Jr.
 Lawrence E. Nerheim, General Counsel, David Ferber, Solicitor, and Charles E. H. Luedde, Attorney Fellow, SEC, Washington, D. C., for Securities and Exchange Commission, amicus curiae.
 Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 On these cross-appeals from a judgment entered November 25, 1974 after a four day hearing in the Southern District of New York, Milton Pollack, District Judge, 384 F.Supp. 507, pursuant to the remand ordered in our prior decision, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2 Cir.), cert. denied, 414 U.S. 910 (1973), for determination of appropriate relief to be awarded to Chris-Craft Industries, Inc. (CCI), the defeated contestant for control of the target corporation, Piper Aircraft Corporation (Piper), resulting from defendants' violations of the federal securities laws, the essential questions are:
 
 
 2
 (1) Whether the district court erred in the method by which it determined a compensatory damage award to CCI in amount of $1,673,988.
 
 
 3
 (2) Whether the district court erred in holding that CCI is entitled to pre-judgment interest and in refusing to award to CCI attorneys' fees and interest expense on the debt incurred by CCI to finance its acquisition of Piper stock.
 
 
 4
 (3) Whether the district court abused its discretion in fashioning equitable relief to implement our mandate.
 
 
 5
 For the reasons below, we affirm the district court's holding that CCI is entitled to pre-judgment interest, its refusal to award attorneys' fees and interest expense to CCI, and its fashioning of equitable relief; but we reverse and vacate its determination of compensatory damages due to CCI and remand with instructions to enter a modified judgment in the amount of $25,793,365, plus pre-judgment interest thereon.I. PRIOR PROCEEDINGS
 
 
 6
 This is the third round in this Court during the tumultuous six years of litigation stemming from the battle for control of Piper. The battle was chiefly between CCI, the unsuccessful contestant, and Bangor Punta Corporation (BPC), the successful contestant. Others (the named defendants-appellees) whose conduct through violations of the federal securities laws contributed to the success of BPC's takeover attempt were held jointly and severally liable with BPC for damages to CCI. On this round in this Court, the issues involve the appropriateness of the relief granted by the district court pursuant to the remand ordered in our last prior decision.
 
 
 7
 We assume familiarity with our prior decisions and those of the district court involving this contest for control of Piper.[1] We shall summarize here only those facts and prior proceedings necessary to an understanding of our rulings on the essential questions stated above.
 
 
 8
 CCI began purchasing Piper shares on December 30, 1968.[2] By January 22, 1969, it had acquired more than 200,000 shares or approximately 13% of the 1,644,790[3] outstanding Piper shares.
 
 
 9
 On January 23, CCI announced a cash tender offer, beginning immediately and ending on February 3, to purchase up to 300,000 Piper shares at $65 per share. The closing price of Piper stock on the New York Stock Exchange (NYSE) on January 22 was $52.50. By February 3, CCI had purchased 304,606 Piper shares through tenders pursuant to its offer and an additional 38,800 shares through cash market purchases. These acquisitions brought its total holdings to 547,106 shares or approximately one-third of the outstanding Piper stock.
 
 
 10
 Piper management (essentially the Piper family) in the meantime had decided to resist CCI's takeover bid. On January 27, Piper sent a letter to its shareholders urging them to reject CCI's offer and advising them that the board of directors "has carefully studied this offer and is convinced that it is inadequate and not in the best interests of Piper's shareholders." A similar letter was mailed by Piper to its shareholders on January 28.
 
 
 11
 One early defensive tactic by Piper involved an agreement entered into on January 28 for the sale of 300,000 authorized but unissued Piper shares to Grumman Aircraft Engineering Corporation (Grumman) at $65 per share. On January 29, a press release was issued and a letter was sent to Piper shareholders announcing the agreement. These communications, however, failed to reveal a "put" arrangement between Piper and Grumman whereby the latter was given an option to put the shares back to the former after six months. This agreement was terminated on March 19 after the NYSE refused to list the new stock.
 
 
 12
 Meanwhile, CCI had decided to try to obtain the additional shares it needed for control through an exchange offer of CCI securities for Piper stock. On February 27, CCI filed an S-1 with the Securities and Exchange Commission (SEC) to acquire between 80,000 and 300,000 shares of Piper. A May 7 press release announced this offer which became effective May 15. CCI's release placed no value on its exchange offer, but the First Boston Corporation (First Boston) valued it at $70 to $74 per Piper share.
 
 
 13
 During the intervening period and after its maneuvers with two other corporations had failed, Piper revived negotiations with BPC which had begun in January. On May 8, a formal agreement was entered into between BPC and the Piper family whereby the latter agreed to exchange all of its Piper holdings (501,090 shares or approximately 31% of the outstanding Piper shares) for a package of BPC securities. BPC also agreed to use its best efforts to acquire more than 50% of the outstanding Piper shares through an exchange offer which placed a value of at least $80 on each Piper share. In addition, if BPC were successful, the Piper family was to receive cash or securities, or both, to bring the value of the package of BPC securities it was to receive up to $80 or more as contrasted with the $70 to $72 value placed on it by First Boston. A press release was issued jointly by Piper and BPC that same day announcing the proposed BPC exchange offer and the $80 value it placed on each Piper share.
 
 
 14
 After issuance of the May 8 press release but prior to BPC's filing of an S-1 on May 29, BPC made cash purchases of 120,200 shares of Piper. Both before and after the BPC exchange offer became effective on July 18, the Piper family, in an effort to insure the success of BPC's offer, wrote three letters to Piper shareholders on June 4, June 20 and July 25 disparaging CCI's offer and recommending that of BPC. The BPC offer which expired on July 29 resulted in the acquisition by BPC of 111,628 shares. First Boston acted as dealer-manager for the BPC exchange offer.
 
 
 15
 In response to the May 8 press release by Piper and BPC, CCI sweetened its exchange offer, which became effective May 15, with $10 cash through a post-effective amendment on May 16. After six extensions, this offer was withdrawn on July 24, by which time CCI had failed to obtain the minimum 80,000 shares specified in the offer. On July 22, CCI filed a registration statement for another exchange offer, effective July 24, adding substantially more value to its earlier package. Pursuant to this offer which expired on August 4, CCI acquired 112,089 shares.
 
 
 16
 After the expiration of both exchange offers, CCI and BPC had acquired 41% and 45%, respectively, of the outstanding Piper shares. CCI made additional purchases of 29,200 shares in August and then withdrew from the battle. BPC continued to purchase Piper shares until September 5, by which time it had acquired a majority shareholder position in Piper (839,306 shares or approximately 51%). As of that date, CCI had acquired 697,495 shares or approximately 42% of the outstanding Piper shares.
 
 
 17
 The instant litigation was begun on May 22, 1969, in the midst of the battle for control, when CCI commenced this action in the Southern District of New York. The complaint alleged violations of the 1933 Act and the 1934 Act. It sought damages and equitable relief.[4]
 
 
 18
 On July 22, CCI moved for a preliminary injunction to prevent BPC from gaining and exercising control of Piper. The preliminary injunction was denied by Judge Tenney on August 19, 1969. 303 F.Supp. 191. We affirmed in an en banc decision on April 28, 1970. Chris-Craft I, note 1 supra.
 
 
 19
 Pursuant to our remand to the district court for further proceedings, Judge Pollack, after a bench trial, on December 10, 1971 dismissed CCI's complaint, holding that many of the alleged violations of the securities laws had not been proven, that those which had been proven had not caused injury to CCI and that CCI had failed to prove its claim for damages. 337 F.Supp. 1128.
 
 
 20
 On appeal from Judge Pollack's decision, on March 16, 1973 we reversed and remanded with directions to grant appropriate relief. Chris-Craft II, note 1 supra. We held, inter alia, that CCI had standing to sue for violations of Section 14(e) of the 1934 Act;[5] that each of the defendants had violated that section and that those violations had caused injury to CCI; and that BPC's violations of Rule 10b-6[6] through its May cash purchases of Piper stock also had caused injury to CCI.
 
 
 21
 In order to understand our rulings on the issues raised on the instant appeal, we shall summarize briefly the basis of our decision on the last prior appeal with respect to the liability of each of the defendants.
 
 
 22
 With respect to the Piper family defendants, we held that they had violated Section 14(e) through: (1) the material misleading statements in their letters of January 27 and 28 to Piper shareholders which said that the pending CCI tender offer of $65 was "inadequate" but which failed to reveal that Piper had received from First Boston its opinion that the CCI offer was "fair and equitable" and that Piper itself was negotiating a large sale of Piper stock to Grumman at the same price; (2) the January 29 press release and shareholder letter which announced the Grumman agreement but failed to disclose the "put" arrangement, that being a material omission; and (3) the June and July shareholder letters which, while disparaging the CCI offer and promoting the BPC offer, failed to reveal that the Piper family stood to profit handsomely under the May 8 agreement should BPC gain control. 480 F.2d at 364-66. We held that all but the third violation (that having been disclosed by a CCI letter to Piper shareholders on June 16) caused injury to CCI by denying it "a fair opportunity to win the contest for control." 480 F.2d at 377.
 
 
 23
 With respect to BPC and its officers, we held that they had violated Section 14(e) by reason of BPC's failure to disclose in its exchange offer registration statement its negotiations for the sale of its 98.7% holdings in the Bangor and Aroostook Railroad (BAR) at a price some $13 million below the figure of $18.4 million at which the BAR was carried on BPC's books and its failure to disclose other circumstances which indicated that the BAR book value was unrealistic and obsolete. 480 F.2d at 367-69. As for the May 8 press release, we held, although it violated Section 5(c) of the 1933 Act (as we had held in our earlier en banc decision, 426 F.2d at 573-76), that it was not misleading and therefore not damaging to CCI. 480 F.2d at 366-67.
 
 
 24
 With respect to First Boston, we held that the material deficiencies in BPC's registration statement and prospectus also provided the basis for Section 14(e) liability on the part of First Boston, the underwriter and dealer-manager for the BPC exchange offer, in that First Boston had not adequately performed its duty in failing to make a reasonable further investigation into the BAR matter when it was aware of facts that strongly suggested that the BPC registration materials were deceptive. 480 F.2d at 369-73.
 
 
 25
 On the basis of the Section 14(e) violations outlined above, we held that the record established that the injuries sustained by CCI were caused by such violations on the part of the Piper family defendants, BPC and its officers, and First Boston. 480 F.2d at 377. Although we agreed with the district court that "CCI failed to show with reasonable certainty that it would have obtained a controlling position in Piper had it not been for the violations of the securities laws by BPC and First Boston", we held that "it is equally clear that BPC itself obtained control through its violations of the securities laws." 480 F.2d at 373. We further held that "(W)hat the securities law violations caused was a denial to CCI of a fair opportunity to compete for control of Piper. The specific injury sustained was a reduction in the value of CCI's Piper holdings upon BPC's unfairly obtaining control." 480 F.2d at 375.
 
 
 26
 We also held in our prior opinion that BPC had violated Rule 10b-6 through its May cash purchases of Piper stock. 480 F.2d at 377-79. As in the case of BPC's Section 14(e) violations, we concluded that, since BPC eventually acquired only 51% of the Piper stock, those unlawful purchases of three large blocks of Piper stock were crucial to its success. BPC's unlawful conduct denied CCI a fair chance to compete for control and enabled BPC to obtain a majority position which caused CCI to suffer a decline in the value of its Piper holdings. 480 F.2d at 379.
 
 
 27
 Having concluded that all defendants had violated the securities laws, we remanded the case to the district court with directions to enter a judgment providing at least the following relief (480 F.2d at 380):
 
 
 28
 (1) Damages, to be assessed against all defendants jointly and severally,[7] to be measured by "the reduction in the appraisal value of CCI's Piper holdings attributable to BPC's taking a majority position and reducing CCI to a minority position, and thus being able to compel a merger at any time."
 
 
 29
 (2) An injunction enjoining BPC from "voting for a period of at least 5 years the Piper shares it obtained through the unlawful May cash purchases and those it obtained through its exchange offer."
 
 
 30
 On remand, the court awarded CCI compensatory damages in amount of $1,673,988, plus pre-judgment interest in amount of $599,010.89. It refused to award to CCI attorneys' fees and interest expense on the debt incurred by CCI to finance its acquisition of Piper stock. It included in the judgment injunctive provisions essentially as follows: BPC was enjoined for a period of five years from voting the 231,002 shares it acquired in violation of Section 14(e) and Rule 10b-6; such shares were not to be counted for the purpose of determining a quorum at shareholders' meetings; such shares were to be considered authorized and outstanding for all purposes under Pennsylvania law and under the judgment; all changes made in Piper's by-laws and in the size of its board since September 4, 1969 were to be rescinded; and no changes were to be made in Piper's by-laws, the size of its board or its corporate charter, unless agreed to by both CCI and BPC or ordered by the court.
 
 
 31
 We turn now to the issues raised with respect to the district court's formulation of damages; its holdings on CCI's claims for pre-judgment interest, attorneys' fees and interest expense; and its grant of injunctive relief.
 
 II. DAMAGES
 
 32
 (A) District Court's Formulation Of Damages
 
 
 33
 Upon remand the district court held a four day hearing. It received extensive testimony and supporting reports from experts called by both sides on the amount of damages to be awarded to CCI to compensate it for the injury it sustained as the result of defendants' violations of the federal securities laws. The court admitted all evidence offered,[8] subject to its determination of what it believed to be an appropriate formula for assessing damages. It emerged with a formula substantially as follows.
 
 
 34
 The court first accepted the general proposition, to which both sides agreed, that our mandate required a comparison of the value of CCI's Piper holdings "prior and subsequent to BP's[9] acquisition of majority ownership." 384 F.Supp. at 512. The court then hypothesized that, in order to make such a comparison, it was necessary to value CCI's holdings both in the situation as it actually existed on September 5[10] and as it theoretically would have existed absent BPC's holding the 14% of Piper stock which it had acquired unlawfully:
 
 
 35
 "Since the inquiry here is to determine the damage suffered by CC attributable to BP, it is therefore appropriate to determine what the value of CC's block of stock would have been worth on September 5 absent BP's illegal conduct, i. e., if CC on that date had led in the contest 42% to 37%. In turn it must be determined how that value was affected by BP's taking a majority position and reducing CC to a minority position." 384 F.Supp. at 512 (emphasis in original) (footnote omitted).
 
 
 36
 To define the elements of that value, the court focused on our direction that "the measure of damages should be the reduction in the appraisal value of CCI's Piper holdings" attributable to BPC's unlawful acquisition of a majority position. Interpreting this phrase literally, the court concluded that, in the context of our reference to BPC's "being able to compel a merger at any time", our use of the talisman "appraisal value" meant a statutory appraisal proceeding available to dissenting shareholders in a merger situation. 384 F.Supp. at 513.
 
 
 37
 Elaborating on this measure of value, the court continued:
 
 
 38
 "Obviously, the objective components of that value, as recognized by the experts such as asset value, and market value remained unchanged in BP's gaining a majority. The relevant block for purposes of such an evaluation is merely an anonymous 100-share block, and each of the experts so proceeded. The 'value' of such a block was not altered by BP's unlawful conduct." 384 F.Supp. at 514.
 
 
 39
 Having concluded that there was no reduction in the intrinsic value of the block of Piper shares held by CCI, the court looked to extrinsic value. In so doing, it utilized the concept of a "premium" for the "opportunity to gain control":
 
 
 40
 "Consequently, the only issue for determination is what premium CC's block would have commanded that disappeared once BP took 'control'. CC is presently in a position no different from that of any minority owner (albeit a large one) of any publicly held corporation. Only that premium representing the value of CC's opportunity to gain control has been removed. Thus, it is the removal of that premium which represents the reduction in value of CC's Piper holdings attributable to BP's acquisition of majority ownership." 384 F.Supp. at 514 (emphasis in original).
 
 
 41
 The first step in the court's attempt to value CCI's lost opportunity to gain control was a determination of the fair market value of Piper stock on September 5 uninfluenced by the fight for control:
 
 
 42
 "Once the fair market value is determined, the value of CC's opportunity to gain control can be evaluated by determining the value of actual possession of control of Piper to CC. That value will be a figure that must be discounted by the factors of probability of success, time, and the economic benefit of that control to CC's holdings." 384 F.Supp. at 515.
 
 
 43
 After summarizing the expert testimony offered by both sides, 384 F.Supp. at 515-17, the court averaged the computations of all of the witnesses and concluded that "a round figure of $48. per share seems a reasonable and justifiable estimate of the fair market value per share of Piper stock as of September 5, 1969." 384 F.Supp. at 517.
 
 
 44
 Turning next to the problem of quantifying the premium the court thought represented the value of CCI's opportunity to gain control, it theorized that this necessitated "a determination of the value of ultimate control of Piper to CC." 384 F.Supp. at 517. While acknowledging that payment of premiums for control is a well-recognized phenomenon in the American corporate system and that there are tangible benefits to be derived from having control, 384 F.Supp. at 517-18, the court was at a loss to explain what CCI hoped to gain by achieving control of Piper beyond the possibility of a later sale or take-out of its investment.[11] Id. at 518-19.
 
 
 45
 Unable to quantify CCI's subjective expectations of what it could do with control, the court opted for a hypothetical sale of CCI's hypothetical plurality position on September 5:
 
 
 46
 "In light of the inability to affix a value to CC's unsuccessful quest for control of Piper (and hence a value to CC for its opportunity to gain that control), the only accurate way of measuring the value of CC's lead position is to determine what CC's position on September 5 was worth to a hypothetical reasonable purchaser." 384 F.Supp. at 520 (footnote omitted).
 
 
 47
 In the court's view, the value of CCI's plurality position to the unlikely purchaser who would be willing to step into CCI's shoes to continue the control battle would have been substantially reduced not only by BPC's tenacious opposition and its commitment to use every resource available to win the contest but also by the fact that the Piper family and management adamantly opposed CCI's takeover bid. Although two of CCI's experts placed the premium value of CCI's hypothetical plurality block as high as 40% above its fair market value, the court credited the testimony of one of defendants' experts, Donald R. Gant, that the premium would be between 5% and 10%. The court referred to Gant as follows:
 
 
 48
 "Gant was the only expert to directly explain and quantify the premium that is at the base of this Court's determination, i. e., the premium that exists in a large minority block when that is counterbalanced by another block almost as large that stands in the way of full harmonious utilization of ultimate control if and when that may be acquired." 384 F.Supp. at 523.
 
 
 49
 The court held that "the opportunity (speculative at best) of gaining a majority from a 42% plurality is generously valued at 5% above fair value of the stock, in such circumstances." Id. (emphasis in original).
 
 
 50
 Taking the valuation of that opportunity at 5% and applying that figure to the $48 per share valuation at which it had previously arrived, the court considered that the total damage to CCI came to the quite insubstantial sum of $2.40 per share. The court thus concluded that the total damages to be awarded to CCI were $1,673,988 (i. e. $2.40 times 697,495, the total number of shares held by CCI on September 5, 1969).
 
 
 51
 (B) Error In District Court's Formulation Of Damages
 
 
 52
 Mindful of the difficult task that confronted the district court in evaluating the extensive expert testimony received at the hearing pursuant to our remand, we nevertheless hold that the court erred in its formulation of the measure of damages to be awarded to CCI.[12]
 
 
 53
 While the court correctly read our mandate as requiring comparison of the value of CCI's Piper holdings "prior and subsequent to BP's acquisition of majority ownership", 384 F.Supp. at 512, we hold that it erred in proceeding on the assumption that the "appraisal value" of CCI's holdings remained unchanged when BPC gained a majority position and in valuing CCI's holdings by resort to an "anonymous 100-share block". Id. at 514.
 
 
 54
 Moreover, the court erroneously assumed that our phrase "appraisal value" referred to a statutory appraisal proceeding. Such connotation, had we intended it, would have justified the conclusion that there had been no reduction in the value of CCI's Piper holdings upon BPC's gaining control. Our opinion in Chris-Craft II, however, expressly forecloses any such intention. We pointed out at least three times that CCI had sustained injury as the result of BPC's unfairly gaining control and that the injury sustained was a decline in the value of CCI's Piper holdings. First, in assessing the impact of defendants' Section 14(e) violations upon CCI, we stated:
 
 
 55
 "The specific injury sustained was a reduction in the value of CCI's Piper holdings upon BPC's unfairly obtaining control. . . . " 480 F.2d at 375.
 
 
 56
 Second, in evaluating the damaging effect of BPC's violations of Rule 10b-6, we held:
 
 
 57
 "BPC's attainment of a majority position has caused CCI to suffer a decline in the value of its Piper holdings." 480 F.2d at 379.
 
 
 58
 Third, in our mandate with respect to the proper measure of damages, we said:
 
 
 59
 "The measure of damages should be the reduction in the appraisal value of CCI's Piper holdings attributable to BPC's taking a majority position and reducing CCI to a minority position . . . ." 480 F.2d at 380.
 
 
 60
 Accordingly, the court's assumption that there had been no such reduction in the value of CCI's Piper holdings was the first step in reaching an erroneous formulation of damages.
 
 
 61
 This error was compounded by the court's resort to an "anonymous 100-share block" in valuing CCI's Piper holdings. The use of such a block fails to recognize that on September 5, 1969, CCI held an illiquid 700,000 share minority block. This cannot be compared to a freely marketable block of shares, as we pointed out in our prior decision in the context of defendants' Section 14(e) violations:
 
 
 62
 "CCI is entitled to compensatory damages for the decline in the value of the minority shareholder's interest with which it became encumbered as a result of competing against those who violated the securities laws." 480 F.2d at 376 (emphasis added).
 
 
 63
 We surely would not have referred to CCI's interest as being encumbered had we visualized it as having the characteristics of a freely marketable 100 share block. Ownership of 700,000 shares representing 42% of a company's stock can hardly be equated to ownership of 100 shares,[13] especially when counterbalanced by a majority block of 839,000 shares, with only 108,000 other shares outstanding.
 
 
 64
 Proceeding on these two erroneous assumptions, the court believed that it had to determine the value of CCI's lost "opportunity to gain control" in order to find that CCI had sustained any loss at all upon BPC's obtaining a majority. On that premise the court then ventured into the realm of sheer conjecture in trying to quantify the subjective value to CCI of such control.[14] 384 F.Supp. at 517-23. We agree with the court that valuing the hypothetical premium that CCI's holdings would have commanded from a hypothetical buyer in a hypothetical sale was "well-nigh an impossible task". 384 F.Supp. at 514. See United States v. Byrum, 408 U.S. 125, 137 n. 10, 138 n. 13 (1972). But we hold that the court erred in assuming that our mandate required it to make such a valuation.
 
 
 65
 In short, we hold that, in failing to recognize a reduction in the value of CCI's Piper holdings upon BPC's obtaining a majority and in resorting to an anonymous 100 share block for purposes of valuation, the court erred in its formulation of the measure of damages to be awarded to CCI by not carrying out the mandate of our prior decision. See Crane Co. v. American Standard, Inc., 490 F.2d 332, 341 (2 Cir. 1973).
 
 
 66
 (C) Correct Formulation Of Damages
 
 
 67
 As indicated above, the district court correctly accepted the proposition to which both sides agreed that our mandate required a comparison of the value of CCI's Piper holdings both before and after BPC acquired a majority shareholder interest on September 5, 1969. 384 F.Supp. at 512. For the reasons that follow, we hold that the "before value" requires consideration of the prices actually paid by the parties for their acquisitions of Piper stock, while the "after value" should be measured by the price at which CCI could have sold its holdings subsequent to September 5.
 
 
 68
 Our use of the term "appraisal value" in Chris-Craft II, 480 F.2d at 380, in the context of measuring CCI's damages, most assuredly did not contemplate that a valuation of CCI's holdings prior to BPC's acquisition of control would result in a figure less than the price actually paid by CCI for such stock. On the contrary, we contemplated a determination of what premium would have to be added to the price actually paid to reflect the value of CCI's block with its opportunity to acquire control.
 
 
 69
 The court below failed to perceive the relevance of these figures. In rejecting the actual prices paid as not probative of the value of CCI's holdings before BPC gained a majority position, the court reasoned:
 
 
 70
 "The amounts paid by the contestants in the midst of the battle are by no means the sole or even a fair indication of the premium relevant herein . . . . The amounts paid were clearly wildly and artificially inflated due to the emotional, as well as actual, struggle of the parties. Such amounts, therefore, must be discarded . . . ." 384 F.Supp. at 515 n. 8.
 
 
 71
 We recognize that tender offers, like other contests, do not take place " 'in the peace of a quiet chamber' ", but "under the stresses of the market place." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2 Cir. 1969). In our view, however, the prices paid in the battle for control of Piper represented what astute businessmen, competing in a free market, thought potentially controlling blocks of Piper stock were worth.[15] As one of our late colleagues astutely observed a half century ago:
 
 
 72
 "When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible." Borg v. International Silver Co., 11 F.2d 147, 152 (2 Cir. 1925) (L. Hand, J.).
 
 
 73
 Here the contemporary evaluations of Piper stock by BPC and CCI, backed up by cash on the barrelhead, strike us as more realistic and persuasive indicators of value than experts' conceptual appraisals years later based on hypothetical smaller lots. Cf. Cities Service Co. v. United States, --- F.2d ---, --- (2 Cir. 1974). We hold that valuation of CCI's Piper holdings prior to BPC's obtaining a majority position should be based on the prices actually paid.
 
 
 74
 This of course is only the starting point in determining the reduction in value of CCI's Piper holdings due to BPC's unlawful acquisition of control. The value of CCI's block subsequent to that event must also be determined. The correct measure of that value subsequent to September 5 is the price at which CCI could have sold its shares. See Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1173 (2 Cir. 1970); Esplin v. Hirschi, 402 F.2d 94, 104-05 (10 Cir. 1968), cert. denied, 394 U.S. 928 (1969). This follows at least in part by analogy to the valuation of CCI's holdings before BPC acquired control based on the prices actually paid. But unlike the "before value" which can be measured by the prices actually paid by the parties, there are no actual figures for the "after value" since CCI never sold its holdings. It is necessary to resort to expert testimony to establish the price at which CCI could have sold its 41% minority interest after BPC acquired control.
 
 
 75
 Since the district court erred in its formulation of the measure of damages to be awarded to CCI, its findings do not contain a proper valuation of CCI's holdings either before or after BPC obtained control. There is evidence in the record, however, to establish those values.[16] Especially since the critical evidence is largely documentary, including the written reports of the experts, we believe this is an appropriate case for us to formulate the correct measure of damages based on the record. Dopp v. Franklin National Bank, 461 F.2d 873, 879 (2 Cir. 1972); Simpson v. United States, 322 F.2d 688, 693 (5 Cir. 1963); Dale Benz, Inc., Contractors v. American Casualty Co., 303 F.2d 80, 82 (9 Cir. 1962); McComb v. Utica Knitting Co., 164 F.2d 670, 674 (2 Cir. 1947); 9 Wright & Miller, Federal Practice & Procedure § 2577, at 701 (1971).
 
 
 76
 There is another reason for our decision not to remand for another hearing on damages. That is "the extraordinary length of time this litigation has already lingered." Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc., 446 F.2d 295, 299 (2 Cir.), cert. denied, 404 U.S. 870 (1971). This case is now in its sixth year of litigation. This is the third appeal to our Court. We have no doubt that, given the tenacity of both sides, a remand would result in still another appeal some two years hence. The ultimate determination of the value of CCI's holdings before and after BPC obtained control in the end would be made by us on the basis of essentially the same record now before us. To remand the case in the light of such a prospect would be a waste of judicial manpower. Seergy v. Kings County Republican County Committee, 459 F.2d 308, 313 (2 Cir. 1972). We hold, in the public interest as well as in the best interests of the parties, that it is appropriate, just and within our power to formulate, on the basis of the record now before us, the correct measure of damages and to order that a modified judgment for damages be entered accordingly. 28 U.S.C. § 2106 (1970).[17] See Petition of United States Steel Corp., 479 F.2d 489, 500-01 (6 Cir.), cert. denied, 414 U.S. 859 (1973); Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc., supra, 446 F.2d at 299; Alexander v. Nash-Kelvinator Corp., 271 F.2d 524, 527-28 (2 Cir. 1959).
 
 
 77
 In formulating the correct measure of damages and modifying the judgment, however, we proceed within certain limits. In modifying the judgment to increase the award of compensatory damages, as the record clearly requires, we believe that the upper limit is the minimum amount of damages that the district court could have awarded without committing reversible error. Petition of United States Steel Corp., supra, 479 F.2d at 501; Traylor v. United States, 396 F.2d 837, 840 (6 Cir. 1968); Mitchell v. Evelyn C. Brown, Inc., 310 F.2d 420, 426 (1 Cir. 1962); United States Fidelity & Guaranty Co. v. United States, 152 F.2d 46, 49 (2 Cir. 1945).
 
 
 78
 With this in mind, we hold that the lowest figure at which the district court could have valued CCI's Piper holdings prior to BPC's acquisition of control was CCI's total cost an aggregate of $44,628,267 for 697,495 shares, or an average of $63.98 per share. 480 F.2d at 354-55. As indicated above, in valuing potentially controlling blocks of shares in a target corporation, great weight must be given to the prices actually paid by businessmen competing in the marketplace for shares to build up their holdings. On the record before us, there is no better indicator of the value of CCI's block than its cost to CCI. Our prior opinion contemplated the determination of a premium, which would have been paid for CCI's opportunity to obtain control, over and above the actual cost to CCI of Piper shares. Such premium, added to CCI's cost, would establish the correct value of CCI's block. Since the minimum amount of that premium would be zero,[18] the lowest possible value of CCI's block therefore would be its cost.
 
 
 79
 This use of CCI's cost, moreover, gives defendants the benefit of the doubt since it results in a per share valuation of CCI's Piper stock of close to $64 the average price paid by CCI. BPC paid $70 to $80 per share for its acquisitions of Piper stock. According to the testimony of its president, BPC thought it had made a sound investment at those prices.[19] Defendants should not be heard to complain of the use of CCI's substantially lower cost.
 
 
 80
 In using CCI's average cost of $64 per share in formulating a measure of damages, we recognize that CCI incurred a normal market risk in paying a sizeable premium above the then current NYSE prices for its purchases of Piper stock. It knew that if it lost in a fair battle it would face the possibility of incurring substantial losses in disposing of its Piper holdings should it decide at that point to sell. In that event it might very well have been forced to shoulder by itself the entire loss measured by the above formula, i. e., the difference between its cost and the price it could obtain for its holdings as a 42% minority shareholder.
 
 
 81
 We squarely held in Chris-Craft II, however, that CCI did not lose in a fair battle. Although we recognized that CCI had not demonstrated that it would have obtained a controlling position in Piper absent defendants' violations of the securities laws, it was "equally clear that BPC itself obtained control through its violations of the securities laws." 480 F.2d at 373. Defendants' unlawful acts caused "a denial to CCI of a fair opportunity to compete for control of Piper. The specific injury sustained was a reduction in the value of CCI's Piper holdings upon BPC's unfairly obtaining control." 480 F.2d at 375. CCI's payments for Piper stock included a substantial premium for the opportunity to compete for control. Defendants' violations unlawfully deprived CCI of that opportunity. We hold that there is no inequity under these circumstances in shifting the entire burden of CCI's loss to defendants. To do so will effectuate congressional intent that "contests for control between offerors and incumbent management, or other offerors, shall proceed fairly." 480 F.2d at 375.
 
 
 82
 Nor do we believe that our formulation of damages results in an improper award to CCI for the value of control, as the court below intimated. 384 F.Supp. at 520. In its attempt to quantify the premium which CCI might have commanded for its shares absent BPC's unlawful conduct, the court, citing Perlman v. Feldmann, 219 F.2d 173 (2 Cir.), cert. denied, 349 U.S. 952 (1955), expressed doubt that CCI could properly retain any premium it might realize upon a hypothetical sale of its "plurality" position, since any sale of its potential to acquire control might make it accountable to other shareholders.
 
 
 83
 Assuming arguendo the correctness of the proposition for which Perlman was cited by the district court, we have carefully considered whether our use of CCI's cost in our formulation of damages results in an improper award to CCI for its opportunity to compete for control, to the extent that CCI's cost exceeded the "fair market value" of $48 as found by the court below. In the instant case, we are not dealing with the sale of control by an entrenched majority shareholder to the detriment of the company or its minority shareholders as in Perlman. At no time has CCI had control. It has had at most a plurality position in a battle for control. Any premium it might have been able to command for its plurality position would not have harmed Piper or its minority shareholders. All shareholders, including those who became minority public shareholders, had the opportunity on an equal basis to sell their shares at the premiums which the contestants offered. It is doubtful whether CCI, which never was in control, owed any fiduciary duty to Piper or its shareholders with respect to the price at which it might sell its plurality shares. In short, we are not here concerned with the sale of control in the context of a possible breach of fiduciary duty.
 
 
 84
 For these reasons, we hold that in formulating the correct measure of damages it is proper to use CCI's cost to value CCI's Piper holdings before BPC's acquisition of control.
 
 
 85
 We turn next to the valuation of CCI's Piper holdings after BPC acquired control. The record discloses that no expert testified that in his opinion CCI could have sold its Piper holdings on the Philadelphia-Baltimore-Washington Stock Exchange where Piper stock was being traded on September 5, 1969. Such a disposition would not have been feasible in view of the large size of CCI's holdings (approximately 700,000 shares) compared with the small number of Piper shares publicly held by others than BPC and CCI (approximately 108,000 shares).[20] The experts did testify that disposal of CCI's Piper holdings was possible only through a public offering or a private placement.
 
 
 86
 The private placement alternative, according to the experts, was not realistic. Although they considered the possibility of placing privately CCI's 42% minority interest, none believed that such a sale, either to another company or on an investment letter basis, was feasible. Indeed, defendants' witness Donald R. Gant, who was highly credited by the district court, essentially disavowed such a possibility. His view was concurred in by two of plaintiff's witnesses, Sigmund Wahrsager and Robert Rosenkranz. Gant testified that, assuming CCI was desperate to unload its Piper holdings on September 5 and further assuming that it had a commitment from BPC and Piper to cooperate in an underwriting by the purchaser at some later time, it would have been possible to effect a private placement at a substantial discount (25-30%) below what CCI could realize in a public offering. However, there was no commitment to register.
 
 
 87
 Since the record shows that the chances of a successful private placement were slim compared with a successful public offering and the price which CCI could have obtained through a public offering was substantially higher, we hold that it is appropriate to compute the value of CCI's Piper holdings after BPC acquired control based on a hypothetical public offering. The evidence as to the price which CCI could have obtained through a public offering was primarily the testimony of two witnesses.[21] Defendants' witness Gant testified that in his opinion a public offering on September 5 would have produced for CCI net proceeds after underwriting fees and other expenses of $41.60 to $43.50 per share. Plaintiff's witness Wahrsager testified that, in view of the necessity for audited financial statements of Piper's fiscal year ending September 30, 1969 before there could be a public offering and allowing time for the registration process, the earliest realistic date for a public offering of CCI's Piper holdings was the end of January 1970. At that time in his opinion CCI would have realized $27 per share.[22]
 
 
 88
 We hold, on the record as a whole, that the Wahrsager figure of $27 represents the most realistic price that CCI could have obtained through a public offering. Gant's assumption that CCI could have made a public offering on September 5, the very day BPC gained a majority, is untenable. Gant himself testified that an offering would have required a registration statement or a no-action letter from the SEC. He based his hypothetical offering on the assumption that a registration statement would have been available as of September 5. He admitted, however, that this would have required a decision by CCI in August that it no longer had any chance to win and that it should dispose of its holdings through a public offering. Leaving aside whether CCI could have proceeded with a public offering based on audited financial statements for the nine months ending June 30, 1969 and even if the cooperation of BPC and Piper in the registration process could have been obtained, it is clear that the battle for control continued at least until August 18 when CCI made its last purchase of Piper stock. In view of the untenable assumptions on which Gant based his opinion, we hold that it was seriously undermined.
 
 
 89
 Aside from the infirmity of Gant's opinion, we would be constrained to use Wahrsager's figure under the long established principle for computing damages which was reaffirmed in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251 (1946), where the Court stated, "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Id. at 265. Here the uncertainties inherent in computing the price which CCI's Piper holdings reasonably would have been expected to bring at a public offering, including the problems of adequate financial statements, delays and market conditions, must be resolved against defendants. This accords with our prior opinion:
 
 
 90
 "By 'resolving doubts in favor of those the statute is designed to protect', Mills v. Electric Auto-Lite Co., (396 U.S. 375, 385 (1970)) we are implementing congressional intent not only to protect investors, but to make sure that contests for control between offerors and incumbent management, or other offerors, shall proceed fairly." 480 F.2d at 375.
 
 
 91
 We hold on this record that it is appropriate to use Wahrsager's figure of $27 per share as the price which CCI could have obtained for its Piper holdings at a public offering after BPC acquired control.[23]
 
 
 92
 To summarize on the issue of damages, we hold that the correct formula for determining CCI's damages is the difference between the price CCI paid for its Piper stock ($63.98) and the price it could have obtained for it through a public offering after BPC unlawfully acquired control ($27). This results in damages of $36.98 per share, or a total of $25,793,365, for CCI's block of 697,495 shares.[24]
 
 
 93
 We therefore vacate the district court's determination of damages due to CCI and remand with instructions to enter a modified judgment in amount of $25,793,365, plus pre-judgment interest thereon.
 
 
 94
 III. PRE-JUDGMENT INTEREST, INTEREST EXPENSE AND ATTORNEYS' FEES
 
 
 95
 The district court on remand also awarded CCI pre-judgment interest from September 5, 1969 on the damages awarded. The court, however, refused to award to CCI its interest expense on the debt it incurred to finance its acquisition of Piper stock, and it refused to award attorneys' fees to CCI. We affirm the district court's holdings with respect to each of these matters.
 
 
 96
 An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness. Blau v. Lehman, 368 U.S. 403, 414 (1962); Wolf v. Frank, 477 F.2d 467, 479 (5 Cir.), cert. denied, 414 U.S. 975 (1973); Norte & Co. v. Huffines,416 F.2d 1189, 1191-92 (2 Cir. 1969), cert. denied, 397 U.S. 989 (1970). Such an award must be compensatory and not punitive. Norte & Co. v. Huffines, supra, 416 F.2d at 1191-92. It is not limited to "a rigid theory of compensation for money withheld", as defendants here contend. Blau v. Lehman, supra, 368 U.S. at 414, quoting from Board of Commissioners v. United States, 308 U.S. 343, 352 (1939). In view of the long delay since the action was commenced and CCI's otherwise nonreimbursable expenses, including attorneys' fees and interest expense, we hold that the district court did not abuse its discretion in awarding pre-judgment interest. Norte & Co. v. Huffines, supra, 416 F.2d at 1192.
 
 
 97
 The court awarded pre-judgment interest at the legal rate from September 5, 1969, the award of interest being $599,010.89 based on a damage award of $1,673,988. Interest was computed at the rate of 71/2% per annum from September 5, 1969 to August 31, 1972, and thereafter at 6%. N.Y.C.P.L.R. § 5004 (McKinney Supp. 1974-1975).
 
 
 98
 Defendants do not challenge the court's power to award the legal rate of interest but only its computation. They argue that the 1972 amendment to Section 5004 which substituted "at the rate of six per centum per annum" for "at the legal rate"[25] is retroactive and that only the 6% rate should have been used in computing interest here. The New York state courts which have spoken on the question have been unanimous in holding that the amendment is not retroactive. 7 Doyer Street Realty Corp. v. Great Cathay Development Corp., 43 App.Div.2d 476, 352 N.Y.S.2d 483 (1st Dept. 1974); Yamamoto v. Costello, 73 Misc.2d 592, 342 N.Y.S.2d 33 (Sup.Ct., Nassau Co., 1973); see Kaufman v. Chase Manhattan Bank, 370 F.Supp. 279 (S.D.N.Y.1974); 5 Weinstein, Korn & Miller, New York Civil Practice P 5004.01 (1973). These authorities support, and we affirm, the district court's method of computation of pre-judgment interest. We include in our remand, however, instructions to recompute pre-judgment interest pursuant to the same method but based on the modified judgment for damages in amount of $25,793,365.
 
 
 99
 CCI appeals from the district court's refusal to award it consequential damages for the interest expense or carrying charges of more than $14,000,000 on the debt it incurred to finance its acquisition of Piper stock. CCI claims that it has been carrying a "locked-in" Piper investment since being reduced to a minority position.
 
 
 100
 We believe that the applicable rule for recovery of consequential damages here is that summarized in Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795, 803 (2 Cir.), cert. denied, 414 U.S. 908 (1973):
 
 
 101
 "A plaintiff seeking consequential damages for fraud, at common law or under federal securities legislation, must establish the causal nexus with a good deal of certainty. Since consequential damages are an addition to or in lieu of what would ordinarily constitute a fair recovery, there is no room here for applying the liberal principles of Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); and Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), where some liberality is required to enable an injured plaintiff to recover anything." (footnote omitted).
 
 
 102
 CCI points to expert testimony which it says demonstrates that it was in fact "locked-in". This contention seems to us to have been undercut by the necessity for the experts to assume a sale of CCI's holdings in order to calculate the proceeds CCI would have realized. Absent any showing of an actual, albeit futile, attempt by CCI to sell its holdings, we find it difficult to find a "causal nexus" between its interest payments and BPC's violations "with a good deal of certainty." We affirm the district court's refusal to award such interest expense.
 
 
 103
 CCI also appeals from the district court's refusal to award it attorneys' fees. It argues that the public interest has been served by its commencing and prosecuting this action. True, awards of attorneys' fees have been recognized as an incentive to the private enforcement of the federal securities laws for the benefit of the investing public. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389-97 (1970); Wechsler v. Southeastern Properties, Inc., 506 F.2d 631, 635 (2 Cir. 1974). Undoubtedly CCI has promoted the public interest in the enforcement of the securities laws by prosecuting this action, but no more so than any private litigant furthers the public interest in suing to enforce rights conferred by statute. Moreover, pursuant to the mandate of our decision today remanding with instructions to enter a modified judgment for damages plus pre-judgment interest thereon, CCI will have recovered a substantial sum out of which it can pay its attorneys' fees and expenses in accordance with the traditional practice. Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1309 (2 Cir. 1973). Since the award of attorney's fees in a case such as this one lies within the sound discretion of the district court, Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, 1050 (2 Cir.), cert. denied, 414 U.S. 1092 (1973), and we find no abuse of that discretion, we affirm the district court's refusal to award attorneys' fees.
 
 IV. EQUITABLE RELIEF
 
 104
 Finally, we come to the injunctive relief fashioned by the district court on remand. For the reasons below, we affirm that portion of the judgment.
 
 
 105
 In addition to directing that damages be awarded to CCI to compensate it for the injury caused by defendants' violations of the securities laws, we ordered that an injunctive provision be included in the judgment which would deny BPC "the fruits of obtaining Piper shares illegally." Specifically, we directed
 
 
 106
 "that the district court include in its judgment an injunctive provision barring BPC from voting for a period of at least 5 years the Piper shares it obtained through the unlawful May cash purchases and those it obtained through its exchange offer." 480 F.2d at 380 (footnote omitted).
 
 
 107
 This contemplated that 231,002 shares, or approximately 14% of the outstanding Piper shares, would be barred from voting. Thus, BPC would be able to vote only 37% instead of 51% of the outstanding Piper shares, while CCI could vote its 42% block. Counting only the shares eligible to vote (1,413,788), this would give BPC 43% of such shares, CCI 49% and the public 8%. CCI in effect would have control through its plurality.
 
 
 108
 On remand, the court included in the judgment essentially the following injunctive provisions, to remain in effect for a period of 5 years from November 25, 1974, the date the judgment was entered (384 F.Supp. at 528-29):
 
 
 109
 (1) BPC was enjoined from voting the 231,002 shares.
 
 
 110
 (2) Such shares, however, would be considered authorized and outstanding for all purposes under Pennsylvania law and under the judgment.
 
 
 111
 (3) The enjoined shares were not to be counted for the purpose of determining a quorum at stockholders' meetings.
 
 
 112
 (4) All changes made in Piper's by-laws and the size of its board of directors since September 4, 1969 were to be rescinded; the by-laws, the size of the board and Piper's corporate charter were to remain as they existed on September 4, unless otherwise agreed by both CCI and BPC or ordered by the court.
 
 
 113
 (5) No increase or decrease in Piper's outstanding voting securities, and no merger, dissolution or liquidation of Piper, could take place without court approval.
 
 
 114
 (6) BPC was to implement provision (4) by calling a stockholders meeting within 90 days.
 
 
 115
 (7) The court retained jurisdiction during the pendency of the injunction to modify it if a change in circumstances warranted.
 
 
 116
 The court's rationale for the injunctive provisions is outlined generally in its opinion, 384 F.Supp. at 523-26, and is set forth in more detail in its memorandum filed November 22, 1974 on the settlement of the judgment. In its memorandum, the court indicated that its objective in providing injunctive relief was to recognize BPC's 51% ownership of the enterprise regardless of its voting rights and to assure that the corporate assets in which BPC holds a 51% interest would not be "merged, liquidated or distributed" without its consent during the period of the injunction.
 
 
 117
 CCI claims that the injunction gives BPC de facto control over Piper contrary to the mandate of our prior decision.[26] In urging that the injunction perpetuates BPC's dominance over Piper despite the fact that CCI now owns a majority of the shares entitled to vote,[27] CCI points to the following consequences of the injunction.
 
 
 118
 First, by virtue of Piper's cumulative voting system, the board of directors will be deadlocked, with BPC and CCI each electing four directors.[28] Second, a stalemated board will not be able to change the appointments of key Piper officials presently in office as a result of BPC's past control. Third, because BPC's shares remain authorized and outstanding for all purposes under Pennsylvania law and under the judgment, BPC can effectively block any major corporate action by failing to vote for it, since CCI cannot obtain a majority of the outstanding shares even with the support of all of the publicly held shares. Finally, with BPC assured of complete control when the injunction expires in 1979, Piper's executives will remain responsive to the wishes of BPC rather than to those of CCI in the interim. CCI urges that all restraints imposed on it by the injunction be removed except for a prohibition against merging Piper into CCI or an affiliate.
 
 
 119
 After careful consideration of CCI's objections to the injunction, we are not persuaded that the district court abused its discretion in fashioning equitable relief to implement our mandate. See, e. g., Lemon v. Kurtzman,411 U.S. 192, 200-01 (1973) (plurality opinion of Chief Justice Burger); Hecht Co. v. Bowles, 321 U.S. 321, 329-30 (1944); cf. SEC v. Management Dynamics, Inc., --- F.2d ---, --- (2 Cir. 1975); SEC v. Shapiro, 494 F.2d 1301, 1308 (2 Cir. 1974); SEC v. Manor Nursing Centers, Inc.,458 F.2d 1082, 1100-03 (2 Cir. 1972). Although we recognize the force of CCI's objections especially that the board is essentially stalemated we believe that, considering the substantial investments of both CCI and BPC in Piper, their own financial interests will motivate them of necessity to cooperate in the management of the corporation and in the hiring of its top personnel, as the record indicates they apparently have done to some extent to date. The injunction does implement our mandate by barring BPC from compelling a merger for a period of five years.
 
 
 120
 If we were to remove all of the restraints imposed on CCI by the injunction as CCI proposes, the effect would be to grant to CCI for a period of five years the very control which it sought but could not prove it would have gained absent defendants' violations of the securities laws.[29] It is true that our prior opinion directed the minimum injunctive relief to be provided. We stated that we did not intend "to foreclose the district court from fashioning such additional appropriate relief as it may find necessary to implement our decision . . . ." 480 F.2d at 380. And our direction that the injunction should bar BPC from voting its ill-gotten Piper shares "for a period of at least 5 years", id., certainly implied that the district court could order the bar for more than 5 years. Under all the circumstances, however, we hold that the district court did not abuse its discretion in fashioning the injunctive relief that it did or in declining to grant more.
 
 
 121
 We have not overlooked the effect of the injunctive relief granted upon the remaining public shareholders of Piper some 1400 persons holding 78,569 shares. The SEC as amicus curiae understandably has expressed special concern for these shareholders. It proposes, instead of merely sterilizing BPC's 231,002 illegally acquired shares, that they be treated as though held in a voting trust and during the period of the injunction that BPC be required to vote the shares in proportion to and in the manner that the publicly held shares are voted. We appreciate the SEC's characteristically helpful and innovative suggestion, and we have considered it with care. We have concluded, however, as the SEC itself candidly recognizes, that its proposal would reopen unnecessarily the battle for control, 480 F.2d at 379, at least for the life of the voting trust. Under all the circumstances, and especially against the background of six years of litigation to date, we think that result should be avoided.
 
 
 122
 We affirm that portion of the judgment that granted injunctive relief.[30]SUMMARY
 
 
 123
 The following is a summary of our essential holdings:
 
 
 124
 (1) We reverse and vacate the district court's determination of damages due to CCI and we remand with instructions to enter a modified judgment in amount of $25,793,365, plus pre-judgment interest thereon, since the correct measure of damages due to CCI is the difference between the price it paid for its Piper stock and the price it could have obtained for it through a public offering after BPC unlawfully acquired a majority shareholder position.
 
 
 125
 (2) We affirm the district court's holding that CCI is entitled to pre-judgment interest on the damages awarded.
 
 
 126
 (3) We affirm the district court's holding refusing to award to CCI its interest expense on the debt incurred to finance its acquisition of Piper stock.
 
 
 127
 (4) We affirm the district court's holding refusing to award attorneys' fees to CCI.
 
 
 128
 (5) We affirm the district court's grant of injunctive relief as within its discretion in implementing the mandate of our prior decision.
 
 
 129
 (6) On the cross-appeal by BPC, First Boston, the Piper defendants and others, we find the claims of error to be wholly without merit.
 
 
 130
 (7) We order that costs be taxed in favor of CCI on its appeal and in favor of CCI on the cross-appeal.
 
 
 131
 Affirmed in part; reversed and vacated in part; and remanded with instructions.
 
 
 
 [1]
 In Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569 (2 Cir. 1970) (en banc) (Chris-Craft I), we affirmed Judge Tenney's denial, 303 F.Supp. 191, of a preliminary injunction sought by CCI to prevent BPC from gaining and exercising control of Piper
 In Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2 Cir.), cert. denied, 414 U.S. 910 (1973) (Chris-Craft II), involving consolidated appeals from judgments in three separate but related actions which had been tried before Judge Pollack, we ruled as follows:
 (1) We reversed the dismissal after trial of CCI's complaint against all defendants, 337 F.Supp. 1128; held that all defendants were liable in damages to CCI for violations of the federal securities laws; and remanded the case to the district court for determination of appropriate relief to be awarded to CCI.
 (2) We affirmed the dismissal after trial of BPC's complaint against CCI. 337 F.Supp. 1147.
 (3) We affirmed the denial after trial of a permanent injunction sought by the SEC against BPC. 331 F.Supp. 1154.
 The instant cross-appeals are from the judgment entered by Judge Pollack on November 25, 1974, 384 F.Supp. 507, pursuant to the remand ordered in Chris-Craft II for determination of appropriate relief to be awarded to CCI, referred to in subparagraph (1) above.
 
 
 [2]
 CCI's decision to seek control of Piper was made at a later date
 
 
 [3]
 Piper's annual report for 1969 states that 1,644,790 shares were outstanding. We therefore shall use that figure, as did the court below, 384 F.Supp. at 525, rather than the figure of 1,644,890 referred to in our prior opinion. 480 F.2d at 350
 
 
 [4]
 CCI's second amended complaint alleged violations of Section 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(c) (1970), and Rule 135 promulgated thereunder, 17 C.F.R. § 230.135 (1974); it also alleged violations of Sections 9, 10(b), 14(e) and 16 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i, 78j(b), 78n(e) and 78p (1970), and Rules 10b-5 and 10b-6 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.10b-6 (1974)
 
 
 [5]
 Section 14(e), 15 U.S.C. § 78n(e) (1970), provides in relevant part:
 "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. . . . "
 
 
 [6]
 Rule 10b-6 prohibits bids for or purchases of a security or any right to purchase any such security by or on behalf of the issuer of a security if the security is "the subject of . . . (a) distribution." 17 C.F.R. § 240.10b-6 (1974). On May 5, 1969, a few days prior to BPC's cash purchases of Piper stock in May, the SEC promulgated a revision of proposed Rule 10b-13 which dealt specifically with exchange offers and, when adopted, would have prohibited BPC's purchases. SEC Exchange Act Release No. 8595 (May 5, 1969). Rule 10b-13 was not adopted until October 15, 1969 and therefore was not applicable to BPC's May purchases. 17 C.F.R. § 240.10b-13 (1974). 34 Fed.Reg. 15,839 (October 15, 1969)
 
 
 [7]
 No liability was imposed on defendant Piper Aircraft Corporation itself since it was not a perpetrator of the violations of the securities laws. Members of the Piper family acted not on behalf of the corporation in committing their illegal acts, but in their own individual interests. 480 F.2d at 379 n. 34. The district court correctly characterized Piper as "the prize in the battle, not a contender." 337 F.Supp. at 1146
 With respect to two officers of First Boston who were named as defendants (Paul L. Miller and Nicholas H. Bayard), on remand CCI stipulated to dismiss the complaint against them, 384 F.Supp. at 510 n. 1, pursuant to our amendment of our prior opinion on petition for rehearing. 480 F.2d at 407.
 
 
 [8]
 The testimony and reports of the experts covered a wide range of proposed valuations of CCI's block of Piper stock at various times and under varying methods of valuation and assumptions
 The evidence included valuations of CCI's holdings as of August 7, 1969 (the date on which BPC's limited exchange offer for the Piper family's stock became effective and subsequent to the close of both the BPC and CCI exchange offers) and as of September 5, 1969 (the date BPC gained a majority of Piper stock). Two valuations were offered for each date. The first was premised upon CCI's trailing BPC on those dates (45% to 41% on August 7, 51% to 42% on September 5). The second assumed that, if the 14% of Piper stock illegally acquired by BPC were eliminated, CCI led the contest on those dates (41% to 31% on August 7, 42% to 37% on September 5).
 The valuations offered included not only the fair market value and value in a statutory appraisal proceeding of CCI's block of Piper, but also such semantic variations as its "investment" value, its "intrinsic" value, and its market "value" as opposed to its market "price".
 And expert opinions were expressed with respect to the price that would be obtained for CCI's Piper shares at hypothetical public and private sales.
 
 
 [9]
 The district court's opinion uses the abbreviations BP and CC for Bangor Punta Corporation and Chris-Craft Industries, Inc., respectively. We shall continue to use the same abbreviations, BPC and CCI, as we did in our prior opinion
 
 
 [10]
 CCI initially urged that the valuation date should be August 7, 1969, but ultimately joined with BPC in agreeing that September 5 was the appropriate date for valuation purposes. 384 F.Supp. at 512 n. 4. We agree that the relevant date is September 5 since that is the date BPC gained a majority shareholder position. Moreover, the record shows that no expert who testified would value the CCI block differently on those two dates, using identical assumptions and valuation methods for each date
 
 
 [11]
 The record shows that the court questioned each expert extensively on the possible benefits CCI might hope to gain by achieving control of Piper
 
 
 [12]
 Although we hold that the district court applied an improper legal standard to the facts in formulating the measure of damages to be awarded to CCI, we nevertheless again commend Judge Pollack, as we did in our prior opinion, 480 F.2d at 349-50, upon the clarity of his latest opinion in this complex case
 
 
 [13]
 In tax cases dealing with the valuation of gifts of large blocks of securities, the principle of "blockage" has long been recognized. Rushton v. Commissioner, 498 F.2d 88 (5 Cir. 1974); Warner v. Commissioner, 193 F.2d 328 (2 Cir. 1952); Richardson v. Commissioner, 151 F.2d 102 (2 Cir. 1945), cert. denied, 326 U.S. 796 (1946); Bull v. Smith, 119 F.2d 490 (2 Cir. 1941). This principle in essence is that the fair market value of a large block of stock actually may be substantially less than the quoted market price because of the inability of the market to absorb a sale of the entire block. Counterbalancing the depressant effect of such a liquidation is the possibility that "a skillful broker could within a reasonable period" liquidate the block in smaller lots at a higher price, Bull v. Smith, supra, 119 F.2d at 492, or the possibility of a secondary distribution. Warner v. Commissioner, supra, 193 F.2d at 329
 
 
 [14]
 The court attempted two alternative quantifications of this value. The first, aimed at measuring the subjective value of control to CCI, failed because no witness was able to value the bundle of advantages CCI hoped to gain by acquiring control. 384 F.Supp. at 517-20, 521-22. The second, aimed at measuring the objective value of CCI's position to a hypothetical purchaser, resulted in the court's finding a premium of $2.40 per share for CCI's opportunity to gain control. 384 F.Supp. at 520-21, 522-23
 
 
 [15]
 This accords with the district court's observation after the first trial:
 "The contest for control of Piper was sophisticated and hard fought. The contenders were men accustomed to the handling of vast sums of public capital, were assisted by skilled professionals and were themselves seasoned in corporate tactics." 337 F.Supp. at 1131.
 We find unpersuasive the arguments of counsel for BPC that the prices paid by the contestants were "irrational", in view of the testimony of David W. Wallace, President of BPC, that BPC had carefully evaluated Piper before seeking control and that he believed BPC had proceeded wisely in going ahead with the Piper acquisition despite the cost involved. Since by its own admission BPC thought Piper stock was worth the price paid, it should not be heard to complain that the price was excessive. Triangle Waist Co. v. Todd, 223 N.Y. 27, 31, 119 N.E. 85, 86 (1918) (Cardozo, J.).
 
 
 [16]
 We recognize that in certain types of cases the failure of the trial court to make necessary findings of fact on the issue of damages requires a remand for such findings. See Hatahley v. United States, 351 U.S. 173, 182 (1956); Alexander v. Nash-Kelvinator Corp., 261 F.2d 187, 191 (2 Cir. 1958). This is especially true in a personal injury case tried to the court where a money judgment necessarily is based on the intangible elements of pain and suffering. In such a case, the trial court's evaluation of the testimony of the witnesses would be crucial. See Mitchell v. Evelyn C. Brown, Inc., 310 F.2d 420, 425 (1 Cir. 1962)
 The instant case is quite different. Here the critical evidence is largely documentary. The testimony of the experts essentially tracks their extensive written reports.
 
 
 [17]
 28 U.S.C. § 2106 (1970) provides:
 "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings to be had as may be just under the circumstances."
 
 
 [18]
 The district court indicated that this might be so here. 384 F.Supp. at 517-23
 
 
 [19]
 See note 15 supra
 
 
 [20]
 See note 13 supra
 
 
 [21]
 Although other witnesses called by both sides testified to valuations of CCI's block of Piper shares after BPC gained a majority, they did not base their opinions on a proposed public offering. Aubrey B. Lank, defendants' witness, based his valuation solely on the amount that could be obtained in a statutory appraisal proceeding. Although plaintiff's witnesses Roger F. Murray and Robert Rosenkranz addressed themselves to the problems of a public offering, they did not specifically premise their valuations on such an offering
 
 
 [22]
 Wahrsager also testified that, if all necessary steps could have been accomplished by the end of November 1969, in his opinion CCI would have realized $33 per share through a public offering at that time
 
 
 [23]
 One of CCI's proposals on the instant appeal is that we require BPC to purchase CCI's block of Piper either at its cost (an average of $64 per share), or at its market value as estimated by CCI's expert Wahrsager ($72 per share), since CCI had no practical way to dispose of its holdings. We reject this proposal, however, because it is belied by the assumed hypothetical sale relied on by the experts in valuing CCI's block after BPC took control. See p. 191 infra
 
 
 [24]
 Approximately the same award of damages would result if we were to accept Gant's testimony regarding a private placement of CCI's 42% minority interest
 The district court, as we have indicated, p. 183 supra, relied on Gant's testimony in arriving at a premium of 5% to be added to the fair market value of CCI's holdings to show the value of CCI's plurality with its opportunity to gain control. The addition of this 5% premium to the $64 per share value of CCI's Piper block at which we previously have arrived, p. 187 supra, would result in a per share valuation of $67.20 for CCI's Piper holdings prior to BPC's acquisition of control.
 Gant testified, see p. 188 supra, that it would have been possible to sell CCI's block on September 5, 1969 to private investors who were looking to be bailed out in a future public offering if BPC and Piper were willing to commit themselves to cooperate in such an offering. Such a sale, however, could be made only at a substantial discount (25% to 30%) below what he thought CCI could obtain in a public offering (net proceeds to CCI of $41.60 to $43.50). While there was no such commitment on September 5, it is realistic to assume that, had CCI approached BPC and Piper on that date and asked for their cooperation, they would have cooperated in order to reduce their exposure to the possibility of a large damage award in the event CCI should prevail in its lawsuit.
 Taking Gant's testimony most conservatively, for the reasons previously stated, p. 187 supra, the application of a 25% discount to Gant's hypothetical offering price of $43.50 would result in an "after value" of $32.62 per Piper share in the formulation of damages. As a check for accuracy, that figure is close to Wahrsager's estimate of $33 for a November 1969 public offering. See note 22 supra.
 If we were to calculate CCI's damages based on this alternative formula, the result would be $34.58 per share ($67.20 minus $32.62) or a total of $24,119,377.
 
 
 [25]
 Prior to September 1, 1972, the legal rate of interest in New York was set by the state banking board at 71/2%. Effective that date, the rate was reduced to 6% by an amendment to N.Y.C.P.L.R. § 5004
 
 
 [26]
 The SEC as amicus curiae supports CCI's position in this respect
 
 
 [27]
 Since our prior decision in Chris-Craft II, both CCI and BPC have purchased additional Piper stock. They now own 708,300 and 857,921 shares, respectively. Sterilization of 231,002 shares owned by BPC now gives CCI not merely a plurality but a majority (50.1%) of the outstanding shares eligible to vote
 
 
 [28]
 Under Piper's cumulative voting system for its eight-man board, CCI and BPC can elect four and three directors, respectively, no matter how many of the publicly held shares are voted. To elect a fourth director, BPC needs only 1,432 additional votes from the public shareholders less than 2% of the publicly held shares
 
 
 [29]
 Our decision today, in remanding with instructions to enter a modified judgment for damages, is intended properly to compensate CCI for the injury it sustained as the result of defendants' unlawfully depriving it of a fair opportunity to obtain control of Piper
 
 
 [30]
 The cross-appeal by BPC, First Boston, the Piper family defendants and others may be disposed of summarily
 To the extent they claim that no damages at all should be awarded to CCI, the claim is rejected for the reasons set forth above in this opinion.
 To the extent they claim that our previous decision in Chris-Craft II was erroneous with respect to the issues of standing, liability and causation, we reject such claims as frivolous. Aside from the original panel decision of this Court on March 16, 1973, 480 F.2d 341, which rejected these precise claims, the panel unanimously denied the cross-appellants' petition for rehearing (after amending the opinion as stated above, note 7 supra), 480 F.2d at 407; the cross-appellants' petition for rehearing en banc was denied, no judge having requested an en banc poll, 480 F.2d at 407; and the Supreme Court denied certiorari without dissent, 414 U.S. 910 (1973).
 We rest on our previous opinion because it represents the law of the case, Zdanok v. Glidden Company, Durkee Famous Foods Division, 327 F.2d 944, 950-53 (2 Cir.), cert. denied, 377 U.S. 934 (1964); because we find no conflict between Chris-Craft II and our intervening decisions of Lanza v. Drexel & Co., 479 F.2d 1277, 1306 n. 98 (2 Cir. 1973) (en banc), and Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1299 n. 17, 1301 n. 20 (2 Cir. 1973), cited by cross-appellants; and because we are satisfied with it. United States v. Certain Property, Etc., 344 F.2d 142, 144 (2 Cir. 1965).